A94A1480, A94A1481. COBB COUNTY SCHOOL DISTRICT
v. MAT FACTORY, INC. et al. (two cases).

(452 SE2d 140)

ANDREWS, Judge.

Cobb County School District (CCSD), plaintiff below, appeals from the grant of summary judgment to defendants MAT Factory, Inc., its president Maloney, and Leisure Lines, Inc. in Case No. A94A1480 and from the grant of attorney fees and expenses under OCGA § 9-15-14 to the defendants in Case No. A94A1481. They are considered together.

*Case No. A94A1480*

1. CCSD alleged breach of contract, fraud, and breach of warranties against Leisure Lines, Inc., MAT Factory, Inc., and Maloney, MAT's president. Summary judgment was granted to all defendants on all claims.

"To prevail at summary judgment under OCGA § 9-11-56 (c), the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. A *defendant* may do this by showing the court that the documents, affidavits, depositions and other evidence in the record reveal that there is no evidence sufficient to create a jury issue on at least one essential element of plaintiff's case. If there is no evidence sufficient to create a genuine issue as to any essential element of plaintiff's claim, that claim tumbles like a house of cards. All of the other disputes of fact are rendered immaterial. [Cit.]" (Emphasis in original.) *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991).

So viewing the evidence, it was that, on June 6, 1991, CCSD and Leisure Lines, Inc. signed a contract obligating Leisure Lines to complete a playground resurfacing of Blackwell Elementary School, for which CCSD would pay $24,990.

Article 6 of the AIA Agreement used for this contract provides that "The contract documents, which constitute the entire agreement between the [parties], are enumerated. . . ." In addition to the agreement and general conditions, the contract documents included "Specifications for Project No. 90/2040/1244, dated March 20, 1991." The only specifications which were produced during discovery by CCSD were for the Blackwell Elementary School Playground Surfacing and bore the correct number, but were dated January 30, 1991. All parties below and here considered these the operative specifications. Subsection 02540 was headed "Playground Surfacing (Fibar System or Equal)" and provided that the bidder would provide "all materials . . . necessary for complete installation of the Fibar System as pat-

ented and licensed for production by Robert Godfrey, Ltd., . . . or wood carpet by Zeager Bros. Inc, . . . or equal." The two specified products were playground coverings composed of wood fiber or chips. The specifications also required that the bidder "certify that the surface depth shown meets U. S. Consumer Products Safety Commission Technical Guidelines for surfacing as follows: Recommendations — when tested in accordance with suggested test methods of the U. S. Consumer Products Safety Commission's Technical Guidelines for Surfacing, paragraph 12.3, a surface should not impact a peak acceleration in excess of 200 Gs to an instrumented ANSI head form dropped on the surface from a maximum estimated fall height." Under the "Building Code and Permits" section 01061, it identifies ASTM and ANSI.[1]

Leisure Lines contacted MAT, a distributor of a plastic-type product called "Safety Deck" which was manufactured in New Zealand by Versatile Plastic Recyclers.[2] Frank Ferris Company imported the product into the United States and MAT was one of its sub-distributors. MAT provided the product to Leisure Lines, whose personnel installed the product on the project. It is not disputed that, with the knowledge and consent of CCSD, Leisure Lines installed the Safety Deck provided by MAT on the Blackwell project and that this installation was accepted by CCSD.

Thereafter, on July 15, 1991, the CCSD Director of Planning sent a memo to the Director of Support Services. To it he attached a copy of "ASTM Designation F 1292-91," the standard specification for impact attenuation of surface systems for playground equipment. The memo further attached a copy of June 18, 1990 test results on Safety Deck performed by Schefsky of Northwest Laboratories. The test had been conducted on a volleyball court in California and stated that impact attenuation was measured "in accordance with the proposed ASTM Standard F8-52." Copies of this test and other MAT promotional literature on the product had been provided to CCSD by Leisure Lines on November 9, 1990 for consideration in deciding which playground covering to purchase for CCSD schools. This was months before the first contract to provide any coverings had been signed by Leisure Lines and CCSD.

The July 15, 1991 memo states that "[b]ecause these test results were conducted in 1990, the 'Test Description' states that the 'Safety Deck' material was tested and measured in accordance with the 'pro-

---

[1] ASTM is the American Society for Testing and Materials and ANSI is the American National Standards Institute.

[2] "Safetytred" was the name given to the product by Versatile. MAT registered that name as well as "Safety Deck" with the patent and trademark office for marketing purposes. It is the same product.

posed ASTM Standard F8-52.' By copy of this . . . I am requesting that [Leisure Lines] furnish me with updated test results in compliance with the ASTM Designation F 1292-91. If the Safety Deck material has not been tested with this new ASTM, I recommend that *no further purchases* of this material be made until the test results are received." (Emphasis supplied.)

Leisure Lines forwarded the memo to MAT for response. In response, on July 23, 1991, Maloney, as president of MAT, wrote to the Director of the Planning Department acknowledging receipt of the memo and stating "[i]n way of clarification, F8-52, that is referred to in the . . . Report is actually the ASTM name for the committee that proposed the ASTM specification designation F1292-91, (see footnote #1, page 1 of the specifications). The tests that were performed under the F8-52 proposed standards are in fact in compliance with the standard specification carrying the permanent designation of F1292-91. I trust this answers your questions."

This contact by Maloney with CCSD is the premise for the warranty and fraud claims against MAT and Maloney. After receiving this letter, on August 8, 1991, the Director of Planning sent a memo to the Director of Support Services referring to Maloney's letter stating that "the tests performed is [sic] in fact in compliance with the . . . ASTM spec." He withdrew any opposition to making additional purchases of Safetytred. The evidence is unrefuted that, in fact, the designation F8-52 was the committee designation and was used for the proposed standard, which, when finalized, was designated F1292-91. The only difference in the two was the inclusion in the proposal of temperature requirements for in-laboratory testing, not site testing as done here.

On December 3, 1991, a letter contract was issued by CCSD to Leisure Lines pursuant to which Leisure Lines would, for $194,415, "provide 'Safetytred' playground surfacing for nine schools [in addition to Blackwell Elementary School], in accordance with your proposal dated October 16, 1991. . . . [T]his letter will constitute an Order for supplying the materials in the amounts . . . below, all subject to the terms and conditions set forth hereinafter." Other than the designation "Safetytred," there are no performance specifications included or alluded to in this contract document. The final paragraph provided that, upon delivery and signing of a receipt for the materials by CCSD, Leisure Lines was to "grant title of this material" to CCSD. The order was accepted by Leisure Lines on January 6, 1992. Installation was to be done by CCSD employees.

For this contract, Leisure Lines initially placed an order with MAT on January 6, 1992, but later cancelled it on January 17 and purchased "Gras-gard" from Pawling Corporation of New York in-

stead.[3] MAT's delivery was going to take 60 days because the product would have to be shipped by Versatile from New Zealand. Because CCSD insisted on 30-day delivery, Leisure Lines cancelled MAT's order and placed it with Pawling, who shipped the Gras-Gard from its New York warehouse to CCSD's warehouse on February 18, 1992. The delivery was accepted by CCSD and nothing was heard by Leisure Lines until September 24, 1992 when Leisure Lines received a letter from the attorney for CCSD indicating the product was "nonconforming" and stating it was no longer wanted. On September 11, 1992, CCSD had Schefsky of Northwest Laboratories conduct a drop test on the Blackwell Elementary School installation of Safety Deck.

2. The crux of CCSD's fraud and warranty contentions is found by comparing the 1990 test results provided by MAT to Leisure Lines and then to CCSD and the test results of the 1992 test on the Blackwell site, conducted by the same person at the request of CCSD. The 1990 California report reflected a "safe fall" height of 7.45 feet on the first test and 8.5 feet on the second test. The 1992 Georgia report shows averages of from four to six feet.

While both reports reflect on their face what is without question correct information on the raw data of the tests, including the condition of the underlying ground,[4] CCSD contends it was somehow misled by the safe fall height, apparently based on the following statement contained in a flyer prepared by MAT from the 1990 test information: "Safety Deck's high test results (*safe fall from almost 9 feet!*) gives the children, their concerned parents, private schools and cities, the assurance that risks are minimized." Even assuming, for purposes of summary judgment, that the information was somehow deficient, this does not give CCSD a cause of action for fraud, breach of contract, or breach of warranty.

(a) "The tort of fraud has five elements: a false representation by a defendant, scienter, intention to induce the plaintiff to act or refrain from acting, justifiable reliance by plaintiff, and damage to

---

[3] "Gras-gard" was the trade name under which Pawling marketed Safetytred, apparently without the knowledge of Ferris, the California importer of Safetytred.

[4] The California site had "natural bermuda grass growing through it. . . . The depth of the grasses above the safety deck was approximately two inches. *The court was in a very wet condition because it had recently been irrigated.* There was standing water just below the top surface of the grasses in some locations. The test data was taken from the driest portion of the court. Because the surface was wet the headform would penetrate deeper into the surface with each successive drop. Therefore, the impact velocity [used to compute safe fall height] could not be controlled with the same precision as normal. However, the impact velocities that were measured were accurate." (Emphasis supplied.)

In contrast, the Georgia Blackwell Elementary site was on red clay, and "[m]ost of the grass was completely worn away in those areas of the playground around the play equipment. These are the areas upon which a child would land when falling from the play equipment. The test was performed at the center of a bare pad adjacent to the high slide."

plaintiff. [Cit.] For an action for fraud to survive a motion for summary judgment, there must be some evidence from which a jury could find each element of the tort." *Crawford v. Williams*, 258 Ga. 806 (375 SE2d 223) (1989).

We consider only the element of justifiable reliance and, so doing, CCSD's "claim tumbles like a house of cards."

Here, the test results were available to all parties involved in the transaction before either contract was signed. CCSD was free to repeat the test where and when it chose, if it so desired, pursuant to any standard it chose, including setting a required safe fall height. It did nothing until 1992, after having entered into the two contracts. "The law does not afford relief to one who suffers by not using the ordinary means of information, whether the neglect is due to indifference or credulity. When the means of knowledge are at hand and equally available to both parties, and the subject of purchase is alike open to their inspection, if the purchaser does not avail himself of these means he will not be heard to say, in impeachment of the contract of sale, that he was deceived by the vendor's representations. Under the circumstances in the case at bar, the trial court did not err in concluding as a matter of law that plaintiffs failed to exercise proper diligence in protecting themselves from defendants' alleged fraudulent concealment." (Citations and punctuation omitted.) *Miller v. Clabby*, 178 Ga. App. 821, 823 (344 SE2d 751) (1986) (alleged concealment of land's location in flood plain). See, e.g., *Copeland v. Home Savings &c.*, 209 Ga. App. 173, 174 (433 SE2d 327) (1993) (alleged misrepresentation of land's flood hazard status); *Condon v. Kunse*, 208 Ga. App. 856 (432 SE2d 266) (1993) (plaintiffs failed to have fescue grass tested on cattle farm before purchase, grass infected with fungus).

CCSD having failed to show *justifiable* reliance, the grant of summary judgment to defendants on the fraud claims was appropriate.

(b) As to the breach of contract claim made against Leisure Lines, the first contract was prepared by CCSD, using an AIA form agreement.

That document contains an "entire agreement" clause. *GRO Assoc. v. Kerr*, 208 Ga. App. 313, 315 (2) (430 SE2d 647) (1993); *Great American Bldrs. v. Howard*, 207 Ga. App. 236, 239 (1) (427 SE2d 588) (1993); *Rucker v. Wynn*, 212 Ga. App. 69, 71 (2) (441 SE2d 417) (1994). Therefore, since the contract documents contain no reference to the 1990 California test, CCSD may not rely upon those test results for any fraud in the inducement claim. Id.

Further, a review of the contract documents does not reveal any mandatory safe fall height which any ground covering had to meet in order to comply with the contract terms. Therefore, having supplied

and installed a mutually agreed upon product, Safetytred, as an "equal" to Fibar, the specified product, Leisure Lines fully complied with the first contract.[5]

Likewise, the second contract specified Safetytred, which was delivered by Leisure Lines to CCSD and accepted. CCSD has made no factual showing, in face of the evidence produced by defendants, that Gras-gard was not in fact Pawling's trade name for Safetytred. This second contract contains no performance specifications and, upon delivery to CCSD's warehouse, Leisure Lines had fully performed.

The grant of summary judgment to Leisure Lines on the breach of contract claim was proper.

(c) The remaining claims were premised on breach of warranty by Leisure Lines and MAT.

As far as Maloney individually is concerned, there was nothing to indicate that he, in preparing the letter concerning the ASTM numbering system, acted as anything other than the president of his corporation. Therefore, no individual liability was possible. *Caton v. Haynes*, 260 Ga. 204, 205 (391 SE2d 107) (1990).

Regarding MAT and express and implied warranties of merchantability, OCGA §§ 11-2-314 and 11-2-315, " '[a]s this warranty clearly arises out of a contract of sale of goods, it can only run to a buyer who is in privity of contract with the seller. (Cit.)' [Cit.] . . . '(I)f a defendant is not the seller to the plaintiff-purchaser, the plaintiff as the ultimate purchaser cannot recover on the implied or express warranty, if any, arising out of the prior sale by the defendant to the original purchaser, such as distributor or retailer from whom plaintiff purchased the product. (Cit.)' (Punctuation omitted.) [Cit.] There being no privity between appellee [MAT] and appellant, the trial court's grant of summary judgment was proper." *Lamb v. Ga.-Pacific*, 194 Ga. App. 848, 850 (4) (392 SE2d 307) (1990).

Even assuming, without deciding, that there was some breach of express or implied warranty by Leisure Lines regarding the performance of Safetytred under the claimed performance criteria of the first contract, there is no contention that there was any notice by CCSD of this claimed deficiency until September 1992, after installation at the Blackwell site in June 1991 and the signing of the second contract in December 1991 and shipment of the goods.

"OCGA § 11-2-714 (1) states: 'Where the buyer has accepted goods and given notification (subsection (3) of Code Section 11-2-607) he may recover . . . damages for . . . the seller's breach. . . .' OCGA

---

[5] Even assuming the Safetytred could not be said, as a matter of law, to be "equal" to Fibar, it can be said, as a matter of law, that CCSD and Leisure Lines jointly departed from this contract term. See *Cho v. South Atlanta Assoc., Ltd.*, 200 Ga. App. 737, 739 (2) (409 SE2d 674) (1991).

§ 11-2-607 (3) requires a buyer who has accepted goods to notify the seller within a reasonable time after he discovered or should have discovered any breach, or be barred from any remedy. A buyer 'accepts' goods when, after having had a reasonable opportunity to inspect them, he fails to make an effective rejection. OCGA § 11-2-606 (1) (b). 'Rejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller.' OCGA § 11-2-602 (1)." *Ohoopee Prod. Credit Assn. v. Aspinwall*, 183 Ga. App. 306, 307-308 (2) (358 SE2d 884) (1987); *Intl. Multifoods Corp. v. Nat. Egg Prods. &c.*, 202 Ga. App. 263, 266 (4) (414 SE2d 253) (1991). We have no trouble concluding, as apparently did the trial court, that rejection here did not occur within a reasonable time. Id.

Therefore, the grant of summary judgment to Leisure Lines was correct.

3. We direct the trial court to assess a penalty of $500 upon receipt of the remittitur in the trial court in accordance with Court of Appeals Rule 26 (b).

### Case No. A94A1481

4. In this case, CCSD appeals from the trial court's orders granting defendants' motions for imposition of attorney fees and expenses.[6]

MAT and Maloney's motion for fees and expenses sought recovery of over $32,522.23 in attorney fees and $3,198.45 in expenses. The court awarded $5,000 in fees and expenses against CCSD and its attorneys pursuant to OCGA § 9-15-14 (b).

"Subsection (b) . . . provides that 'the court may assess reasonable and necessary attorney's fees and expenses of litigation . . . if, upon the motion of any party or the court itself, it finds that an attorney or party brought or defended an action, or any part thereof, that lacked substantial justification or that the action, or any part thereof, was interposed for delay or harassment, or if it finds that an attorney or party unnecessarily expanded the proceeding by other improper conduct. . . . As used in this Code section, "lacked substantial justification" means substantially frivolous, substantially groundless, or substantially vexatious.' Claims asserted pursuant to . . . subsection . . . (b) are to be adjudicated by the trial court without a jury. [Cits.] The standard of review . . . for motions under OCGA § 9-15-14 (b) is the 'abuse of discretion' rule. [Cit.]" *Gibson v. Southern Gen. Ins. Co.*, 199 Ga. App. 776, 778 (3) (406 SE2d 121) (1991).

---

[6] This matter is properly considered without the necessity of an application under OCGA § 5-6-35 (a) (10). *Haggard v. Bd. of Regents &c.*, 257 Ga. 524, 527 (4c) (360 SE2d 566) (1987).

Here, because, as discussed in Divisions 1 through 3, supra, there was no cognizable claim against Maloney or MAT, and because there was sufficient proof before the court of the amount of fees and expenses, we cannot say that the court abused its discretion in awarding MAT and Maloney the $5,000 in fees and expenses. *Campbell v. Bausch,* 195 Ga. App. 791, 792 (2) (395 SE2d 267) (1990).

5. As to Leisure Lines, however, the record provides no factual basis for the amount or reasonableness of the attorney fees or expenses incurred in defending the suit, although there is a sufficient finding that the suit pursued against it was substantially groundless. Therefore, the award of fees and expenses to Leisure Lines is vacated and the case remanded for consideration of the amount of fees and expenses incurred. *Duncan v. Cropsey,* 210 Ga. App. 814, 816 (2) (437 SE2d 787) (1993).

*Judgment affirmed in Case No. A94A1480. Beasley, P. J., and Johnson, J., concur. Judgment affirmed in part and reversed in part in Case No. A94A1481. Beasley, P. J., and Johnson, J., concur.*

DECIDED NOVEMBER 28, 1994 —
RECONSIDERATION DENIED DECEMBER 19, 1994 — 

*Brock & Clay, D. Glenn Brock, E. Linwood Gunn IV, Richard W. Calhoun,* for appellant.

*Dennis, Corry, Porter & Gray, William E. Gray II, Stephanie F. Goff, Steven H. Ballard,* for appellees.