A98A2472. NORTHEN et al. v. MARY ANNE FROLICK & ASSOCIATES et al.
(510 SE2d 857)

Judge Harold R. Banke.

Mary Anne Frolick & Associates, d/b/a Re/Max Achievers ("Re/Max") obtained a default judgment against Arthur J. Northen, Jr. after Northen breached a January 1995 real estate contract to purchase a $3.2 million home. The trial court imposed the default judgment as a sanction for certain discovery problems.[1] It awarded $97,500 plus interest to Re/Max on its breach of contract claim and $1,560 in attorney fees as damages for its bad faith claim.

After entry of default, Northen retained R. Scott Tobin, who served as Northen's counsel from May 1, 1997 until October 7, 1997. One day before a bond hearing, Tobin filed an affidavit of indigency on Northen's behalf.

It is undisputed that as of the time of the bond hearing on June 24, the marital residence and several luxury automobiles were not titled in Northen's name. Northen's greatest potential asset was B & N Companies, Inc. ("B & N"), a computer software company. But Northen's accountant, CPA Richard Griffin, told Northen and Tobin that B & N was worth "nothing." Griffin sent Tobin a 25 page facsimile showing that all of B & N's stock had been issued to Northen's wife, Bonnie. The cover sheet for the fax stated, "B&N Company supporting documentation Bonnie Northen — sole shareholder."[2] Tobin testified that the document from Griffin, combined with information from Northen, satisfied him that his client could properly avail himself of the protections of OCGA § 5-6-47.

During the hearing it was agreed that B & N would be subjected to extensive discovery to determine if Northen was concealing assets or income from Re/Max. Near the end of the hearing, when the court asked Tobin whether Northen could assist in production of documents from B & N, Tobin responded, "He's not a shareholder but he is an officer, and he can assist." In so stating, Tobin erroneously indicated that Northen was not a shareholder in B & N when, in fact, he was the principal shareholder. When Tobin subsequently discovered

---

[1] Northen is not a party to this appeal.

[2] Griffin incorporated B & N. The articles of incorporation list Bonnie Northen as the registered agent, president, and secretary/treasurer.

his error, he personally apprised opposing counsel about Northen's stock interest on or about July 9 about two weeks after the hearing.

Notwithstanding the affidavit of poverty, the court ordered Northen to post a supersedeas bond in the amount of $182,401 and ordered detailed discovery involving B & N's corporate records. Two days later, Tobin filed a supplemental affidavit wherein Northen testified, "I am indigent and because of my indigence I am unable to give bond in this matter." Re/Max filed a traverse of Northen's affidavit on August 7. Prior to the scheduled hearing on Re/Max's traverse, the parties engaged in about two months of discovery. One day before the traverse hearing, Northen withdrew his affidavit. At the September hearing, without receiving testimony from a single witness, the trial court concluded, "the filing of this affidavit, just based on what I have heard, was for the purpose of prolonging this litigation and thwarting efforts to collect this judgment." After Re/Max apparently targeted Tobin, filing two motions for contempt and a motion for attorney fees, Tobin withdrew as Northen's counsel. The trial court issued an order on October 9, 1997 requiring Northen to appear and show cause why he should not be found in contempt of court for his conduct and/or that of his counsel related to the filing of the affidavits.

Eventually, the trial court conducted a hearing encompassing Re/Max's OCGA § 9-15-14 motion and the court's own sua sponte OCGA § 9-15-14 motion.[3] The show cause hearing in early 1998 was directed to five issues: 1) filing an affidavit of poverty while receiving millions of dollars of untaxed money; 2) filing an affidavit of poverty without a reasonable and timely investigation of the cost of obtaining a bond; 3) representing to the court that Northen was not a shareholder of B & N; 4) representing to the court that Northen had no bank accounts in his name when he had just closed a First Union account; and 5) unilateral termination of a court-ordered deposition.

At the show cause hearing, Griffin testified that the day he sent the fax, he had told Tobin that B & N was "insolvent." A First Union employee testified that the "close date" for the Northens' joint checking account was May 30, 1996, a date many months before Re/Max obtained judgment for the real estate commission and long before Northen retained Tobin here.

---

[3] At some point after Northen replaced Tobin with L. Brown Bivens as his new counsel, Northen's and Tobin's interests diverged. Beginning in October 1997, Bivens engaged in settlement negotiations with Re/Max. In April 1998, on behalf of Northen, Bivens sought to enforce a settlement agreement with Re/Max in which Northen had agreed to provide his cooperation and assistance to Re/Max in its contempt proceedings against Tobin. Bivens wrote to Re/Max's counsel, "I am sure that you will agree that I have bent over backwards to cooperate with you and to assist you in connection with the resolution of these claims and with the contempt action against Mr. Northen and against Mr. Tobin."

Northen's testimony was equivocal and inconsistent.[4] Although Northen testified that he and Tobin "did not even talk about a bond," elsewhere he admitted they did discuss obtaining a bond. Northen conceded that he knew that he "probably could have gotten a bond," notwithstanding his testimony that he could not do so. Although Northen testified that he "thought the stock was in my wife's name," Shareholders Income Tax Schedule K-1's, sworn federal tax documents bearing his signature belie that claim. Although Northen asserted that "[i]t was true I had no assets in my name," he conceded that he gave false testimony in his June 26, 1997 affidavit of poverty.

B & N's corporate counsel, David Stockton, confirmed that Northen had contacted him to inquire about the stock ownership question. When Tobin sought to ascertain what Northen had been told, Stockton was unable to respond because Northen refused to waive his attorney client privilege. Nor did the court permit Stockton to testify as to what he had told Tobin when Tobin contacted him about the stock ownership. The trial court curtailed Stockton's testimony which Tobin claims would have confirmed his misunderstanding about the stock being in Bonnie Northen's name.

Tobin testified that Northen complained to him about heavy-handed post-judgment collection tactics employed by Re/Max which, while unsuccessful due to his lack of assets, were disrupting his business and personal life. Northen had a prior bankruptcy and told Tobin he had no personal assets and no one from whom to borrow that amount of money. Tobin claimed that Northen told him the First Union account had no money and had been closed. When Tobin discussed with Northen the possibility of filing an affidavit of indigence in the event Northen could not post the bond, Tobin asked Northen to meet with his accountant before filing the affidavit to confirm his lack of sufficient assets.

Tobin testified that he did not know that Northen owned any part of B & N when he stepped into court on June 24, 1997. Tobin explained that he believed that Bonnie Northen owned all the stock. Tobin also testified that Northen told him that B & N was "upside down," and that Griffin had told him that B & N was "insolvent." By deposition, Griffin confirmed that he had told Northen that B & N was insolvent and worth "nothing." In Griffin's opinion, as of the end

---

[4] The hearing spanned portions of January 29, February 2, 19, and 27, 1998. During that time frame, Northen and Re/Max were embroiled in settlement negotiations and purportedly reached a settlement on February 3. Northen's brief in support of his motion to enforce that settlement stated, "[i]n further reliance upon the settlement agreement, Northen presented very little defense to the contempt action brought by Plaintiff or to Kreimer's request for extensive attorney's fees, and even assisted Kreimer [Re/Max's attorney] in the presentation of evidence in the case."

of 1996, the company's worth was zero.[5]

Tobin testified that it was still his belief that based on what Northen told him that Northen was not bondable and that B & N's stock was not worth the amount of the judgment ($182,000). Steven J. Laffler, B & N's controller, in a September 4, 1997 deposition confirmed that B & N was in dire financial straits and had trouble paying its obligations. According to Laffler, B & N's financial situation was "poor."[6]

In response to the court's query as to what steps he had taken prior to filing the affidavit, Tobin testified that in order to obtain financial information, he had contacted opposing counsel and sought financial statements and other information from Northen. Northen told him that B & N had creditor problems and that the marital home was heavily mortgaged and in his wife's name. Before filing the affidavit, Tobin relied upon Northen's accountant, B & N's controller, and Northen for the facts underlying Northen's financial situation. Tobin had no recollection of an interrogatory response he had filed in another case that Northen was a shareholder and emphatically testified that had he known otherwise, he would never have stated that Northen did not own stock. Tobin testified that a few days after the bond hearing, when B & N's corporate counsel told him otherwise, he contacted Northen who claimed "that must be a mistake." Tobin testified, without contradiction, that he duly informed opposing counsel about his error.

Tobin explained that he had suspended Northen's deposition because he believed that opposing counsel was intentionally violating the trial court's confidentiality order. It is undisputed that before postponement of the deposition, counsel made two unsuccessful attempts to contact the court for guidance. To protect his client from Re/Max's threats "to bury" Northen as well as to pursue criminal prosecution against him, Tobin ended the deposition on Friday afternoon pending a ruling from the court and made Northen available to testify on Monday.

Citing time constraints, the trial court refused to allow two experts to testify on Tobin's behalf. An offer of proof was made as to both witnesses. Michael Paul, a fidelity and surety bond manager, would have testified that he routinely rejects bonding applications from persons like Northen, who have filed bankruptcy. Paul, a

---

[5] B & N's balance sheet for the year ending December 31, 1996 indicates a negative total capital value of –$3,332,466. B & N's balance sheet for the period ending May 31, 1997 shows a negative total capital of –$2,593,503.

[6] Laffler testified that B & N's financial position had drastically deteriorated in 1996 and 1997 due to a heavy debt load, creditor claims, and the loss of market share in the highly competitive computer software business. B & N had also downsized dramatically. Laffler revealed that Northen was heavily in debt to B & N and owed $1.5 million to B & N.

licensed bonding agent, would have confirmed that Northen could not have qualified for a $182,000 bond. Gregory Gallagher, a CPA, would have testified that a company's financial status cannot be determined from income statements as Re/Max claimed. Gallagher also would have testified that in his opinion, B & N was not solvent and B & N's stock had no value due to B & N's negative net worth. This excluded evidence would have supported Tobin's testimony that he had a good faith belief that Northen was not bondable and that B & N was insolvent in June 1997.

The trial court found that Tobin had incorrectly represented to the court that Northen was not a shareholder in B & N, when, in fact, Tobin, in a February 3, 1997 interrogatory response for a different case, had answered, "Mr. Northen is a shareholder, officer, and director of B&N Companies, Inc." The court found that "Tobin knew or should have known B&N Company was solvent [on June 24, 1997]." The court determined that Tobin "filed the Affidavits of poverty with approval from Defendant [Northen] for the purpose of delaying the proceedings to accomplish diversion of Defendant's assets." The court held that the affidavits were false, filed in bad faith, and made wilful misrepresentations. The court also concluded that Tobin lacked legal grounds to terminate the court-ordered deposition. Based on these factual findings, the court imposed sanctions under OCGA § 9-15-14 of $27,157.69 against Tobin and $13,376.17 against Northen.[7] Enumerating ten errors, Tobin appeals. *Held*:

1. Tobin contends that the trial court erred in refusing to permit the expert testimony of a licensed bonding agent and a CPA in support of his defense. We agree. "Punishment should not be imposed on a party [or his attorney] to a civil case for conduct which is ancillary to the merits of the case and which occurs during the life of the case without a consideration of the nonmovant's defense of its conduct." *General Motors Corp. v. Conkle*, 226 Ga. App. 34, 42 (1) (a) (486 SE2d 180) (1997). Given the potential for imposition of sanctions, Tobin should have been afforded a full opportunity to present his defense. The excluded expert testimony would have corroborated Tobin's belief that B & N was insolvent and Northen was not bondable, thereby negating a finding of bad faith. *Dept. of Transp. v. Woods*, 269 Ga. 53, 56 (494 SE2d 507) (1998). Exclusion of evidence critical to Tobin's defense was reversible error. *Whidby v. Columbine Carrier*,

---

[7] The order awarding Re/Max "every penny" it sought for attorney fees included attorney fees for routine post-judgment discovery and for fees for Re/Max's in-house counsel, Howard Delashmit, who never testified as to the necessity for his services or the reasonable value of his fees. See *Mitcham v. Blalock*, 214 Ga. App. 29, 31-32 (2) (447 SE2d 83) (1994) (court must limit an award to actual and reasonable costs incurred as a result of sanctionable conduct). *Oden v. Legacy Ford-Mercury, Inc.*, 222 Ga. App. 666, 668-669 (2) (476 SE2d 43) (1996).

182 Ga. App. 638, 648 (6) (356 SE2d 709) (1997) (overruled on other grounds, *Pender v. Witcher*, 194 Ga. App. 72, 74 (389 SE2d 560) (1989)).

2. Tobin contends that the trial court abused its discretion in finding him liable for attorney fees under OCGA § 9-15-14. We agree and reverse. *Bass v. Pearson*, 219 Ga. App. 487, 488 (466 SE2d 17) (1995).

The threshold inquiry is the nature of the duty implicitly imposed upon an attorney when his client tells him that his company is "upside down," he has no assets, and a judgment creditor is hounding him. Here, the record indicates that Tobin did not solely rely upon Northen's claims of insolvency but required Northen to verify his financial situation with his accountant. In light of Tobin's legal duty to his client, who asserted that Re/Max was subjecting him and his business to harassment, and who apparently did not disclose to Tobin his stock ownership in B & N which he understood had a negative value, we cannot say that Tobin's investigation of Northen's financial circumstances before filing the affidavits was inadequate. See *Tarver v. Wills*, 174 Ga. App. 550, 551 (1) (330 SE2d 896) (1985). Hindsight is always 20/20.

Apparently, the trial court hinged its decision on the credibility of Northen, without giving weight to Northen's admitted perjury or to the inconsistencies in Northen's testimony. See *Mutual Ins. Co. of New York v. Dublin Pub.*, 190 Ga. App. 94, 95 (378 SE2d 497) (1989) (findings of fact will not be set aside unless clearly erroneous). However, Northen's contradictory testimony about not discussing the bond with Tobin and his affidavit averring that he was "unable to give bond," must be construed against Re/Max who bore the burden of proof on this issue. *Prophecy Corp. v. Charles Rossignol, Inc.*, 256 Ga. 27, 31 (3) (343 SE2d 680) (1986). See *Ferguson v. Scadron*, 227 Ga. App. 614, 615 (489 SE2d 873) (1997). When Tobin's misstatement about the stock ownership is considered in context, its significance is questionable. It would defy logic to believe that Tobin would have deliberately misrepresented to the court Northen's ownership interest in B & N while simultaneously agreeing that discovery would include B & N's corporate minutes, B & N's stock ledgers, B & N's financial statements, salary and expense reports, and a wealth of other internal corporate documents. This information, especially the stock ledgers and corporate minutes, would have readily exposed Northen's stock ownership.

Notwithstanding the trial court's conclusion to the contrary, the record contains no evidence that Tobin delayed the proceedings to "accomplish diversion of Northen's assets." In fact, the record is devoid of any evidence that Northen diverted assets after filing either affidavit or that the filings were instigated for "purpose of

delaying the proceedings to accomplish diversion of Defendant's assets." Although Northen claimed the affidavits were a "stall tactic," Tobin vehemently denied that claim. Tobin testified without contradiction that "looking at the statute and the proceedings, I thought this [resolution of the indigency issue] would all be done within a few days. So I had no reason to even believe or suggest to anyone that this was some sort of stalling tactic. I expected an answer actually pretty quickly."

Significantly, Re/Max failed to offer evidence demonstrating any nexus between any delay in the proceedings attributable to the filing of the affidavits and the diversion of Northen's assets. It is undisputed that the transfer of Northen's interest in the marital residence as well as the stock transfer occurred long before Tobin became Northen's counsel. As to the First Union joint checking account, it had been closed even before Re/Max filed suit. Moreover, if B & N was insolvent and its stock worthless, as Tobin testified that he believed, who owned it would have been immaterial to Northen's purported indigency or bondability.

These conclusions are supported by Re/Max's subsequent lawsuit filed against both Arthur and Bonnie Northen on March 25, 1998. Re/Max alleged, inter alia, that Northen fraudulently transferred his interest in the residence to his wife ten days after being served with its suit, and conveyed all his personal property, wages, and income to his wife during the pendency of Re/Max's suit. Notably, Re/Max alleged that the fraudulent transfers and conveyances had rendered Northen insolvent and made no claim that the stock had been fraudulently transferred. None of these purported misdeeds occurred while Tobin served as Northen's counsel in the underlying case or after the affidavits were filed.

Re/Max painted an elaborate portrayal of the Northens' lavish lifestyle, fancy home, high income, and luxury vehicles, ignoring facts disclosing a reversal of fortunes and substantial indebtedness. But even assuming arguendo, that Northen himself lacked the resources to post the bond without assistance, Re/Max points to no authority, and we know of none, which would obligate his spouse to do so from her personal resources.

In sanctioning the misconduct surrounding the filings, the trial court imposed punishment on Tobin for Northen's misconduct for averring that he could not obtain a bond when Northen apparently knew otherwise. This was plainly unfair in the absence of evidence of complicity or duplicity. In light of what Tobin knew, it cannot be said that Tobin lacked "substantial justification" for his actions. Compare *Cobb County School Dist. v. MAT Factory*, 215 Ga. App. 697, 703 (4) (452 SE2d 140) (1994). Similarly, the record does not show bad faith on Tobin's part. *Sacha v. Coffee Butler Svc.*, 215 Ga. App. 280, 282 (2)

(450 SE2d 704) (1994). Nor does the record show that Tobin engaged in improper conduct, intended to harass Re/Max or attempted to interpose delay to enable Northen to divert assets. Having reviewed the record, we find that it fails to satisfy the criteria for imposing sanctions against Tobin. *Woods*, 269 Ga. at 56. Therefore, the attorney fees awarded against Tobin cannot stand. Id.

In light of the above disposition, we need not address the remaining enumerations of error.

*Judgment reversed. Johnson, C. J., and Smith, J., concur.*

DECIDED JANUARY 7, 1999 —

*Hendrick, Phillips, Schemm & Salzman, Victoria H. Tobin*, for appellants.

*Bivens, Hoffman & Fowler, Luther B. Bivens, Stanley E. Kreimer, Jr.*, for appellees.