## A02A0369. SOUTHEAST RECOVERY SERVICES, LLC v. NORTHEN.
(565 SE2d 861)

MILLER, Judge.

As the assignee of stock in B&N Company, Inc. (B&N), Southeast Recovery Services, LLC (SRS) sued Arthur A. Northen for a deficiency on the value of B&N stock pledged by Northen as collateral on a secured transaction. The trial court granted summary judgment to SRS on the issue of Northen's liability in the amount of $1.7 million but denied SRS summary judgment on the issue of the value of the collateral sold at foreclosure. In this cross-appeal, SRS contends that the trial court erred in finding that a jury issue remains as to the commercial reasonableness of the foreclosure sale of the collateral.[1] We agree and reverse.

The underlying litigation arose after Northen defaulted on contractual obligations incurred with Stephen E. Raville. In December

[1] In Case No. A02A0368, Northen filed a notice of appeal of the summary judgment order on June 8, 2001. Afterward, he failed to file a brief. This Court dismissed Case No. A02A0368, *Northen v. Southeast Recovery Svcs.*, after no party was substituted for Northen who died on September 19, 2001. Northen did not file a brief in this cross-appeal.

1995, Northen, as seller, and Raville, as purchaser, entered into a stock purchase and sale agreement. Raville paid Northen $1 million for 42.15 shares of common stock in B&N, a company begun by Northen in 1994 to sell computer software. Prior to this sale, Northen owned 750 shares of common stock in B&N. Contemporaneously with the purchase and sale agreement, Northen and Raville executed a pledge and assignment of collateral agreement and irrevocable proxy for an additional 42 shares of common stock of B&N. Paragraph 5.4 of Article V of the stock purchase and sale agreement obligated Northen to repurchase the 42 shares from Raville for $1 million in one year if Raville gave proper notice and demand. In the event of default, the pledge agreement authorized the secured party (Raville) the discretion to issue a demand upon Northen for full payment. The agreement further provided that in the event of default: "In furtherance of the Secured Party's rights and remedies hereunder and not in limitation thereof, the Secured Party shall have full power and authority to sell, assign, transfer and deliver the whole of the Collateral, or any part thereof. . . ."

In November 1996, Raville notified Northen of his intent to invoke the repurchase provisions in Paragraph 5.4. Northen, however, claimed that he was unable to pay the repurchase price. As a result, in December 1996, Northen and Raville entered another agreement in which Northen pledged his remaining 665.85 shares of B&N as additional collateral and, in exchange, Raville agreed to extend the repurchase and payment obligations of Paragraph 5.4 until June 1, 1998, at which time Northen would be required to pay $1.7 million to Raville.

In October 1998, B&N filed for bankruptcy. In November 1998, after Northen had still failed to satisfy his obligation to pay $1.7 million, Raville notified Northen that his breach constituted an "event of default." About six months later, on June 1, 1999, Raville assigned all his rights, claims, and interest that he had against Northen to SRS, an entity in which Raville was a majority member. On June 4, 1999, SRS notified Northen by regular and certified mail of its intention to foreclose upon its security interests in the collateral and to sell the collateral at public auction under the terms of the Georgia Uniform Commercial Code. SRS informed Northen that in the event that it was unable to sell the collateral for the full amount due, SRS was reserving the right to pursue a deficiency claim against him. SRS advertised the public sale on June 7 and June 14, 1999, and on June 18, 1999, the B&N stock was offered for sale at public auction. Having received no bids, SRS purchased the collateral for $50,000. After the foreclosure sale, SRS sued Northen for the deficiency. SRS sought to collect $1.7 million plus interest, costs, and other expenses, less credit for the $50,000 obtained from the foreclosure sale.

SRS moved for summary judgment, arguing that because the amount of $50,000 for the sale of the collateral was the result of a commercially reasonable sale, and because the undisputed evidence showed that Northen owed $1.7 million less a credit for $50,000, SRS was entitled to summary judgment to also include interest, attorney fees, and expenses of litigation.

Finding that Northen had, in fact, defaulted on his debt of $1.7 million now owed to SRS, the trial court granted only partial summary judgment to SRS. The trial court refused to grant judgment to SRS in that amount because it found "there exists a question of fact as to whether the disposition of the collateral was reasonable, considering the timing of the bankruptcy and the sale." The court also noted that questions of fact remained regarding the value of the collateral since SRS paid $50,000 for collateral it declared "worthless." The trial court ruled, "[t]herefore, the Plaintiff's motion for summary judgment in connection with the value of the collateral, whether its disposition was commercially reasonable and whether the appropriate amount was offset against the $1,700,000.00 owed, is hereby DENIED."

1. SRS contends that the trial court erred in finding summary judgment was precluded by a material question of fact as to whether the sale of the stock pledged by Northen and purchased by SRS was commercially reasonable within the meaning of the Georgia UCC. SRS asserts that the record contains no competent evidence to show that the value of the collateral was anything other than $50,000. We agree and reverse.

When Northen defaulted on his obligation, under the Georgia UCC, as a secured party, Raville was entitled to "sell, lease, or otherwise dispose of any or all of the collateral in its then condition." Former OCGA § 11-9-504 (1). The stock purchase agreement authorized Raville to assign his rights to the collateral, which he did to SRS. Under the framework of the UCC, the "[s]ale or other disposition may be as a unit or in parcels and at any time and place or on any terms but every aspect of the disposition including the method, manner, time, place, and terms must be commercially reasonable." Former OCGA § 11-9-504 (3). When a secured party either sells the collateral in the usual manner in any recognized market therefor or when he has otherwise sold the property in conformity with reasonable commercial practices among dealers in the type of property sold, the secured party has sold the collateral in a commercially reasonable manner. See former OCGA § 11-9-507 (2); *Farmers Bank &c. v. Hubbard*, 247 Ga. 431, 432 (276 SE2d 622) (1981).

It is undisputed that B&N was not a publicly traded stock. Raville testified that the B&N stock was essentially worthless at the time of foreclosure and that "$50,000.00 was considerably more than

the fair and reasonable value of the collateral." As Northen himself acknowledged, the corporation filed for liquidation under Chapter 7.[2] The corporation was in bankruptcy on June 18, 1999, the date of the public sale of the B&N stock.

At the motion hearing, counsel for SRS explained that the $50,000 figure was selected "as being something too high to be challenged as unreasonable." But Northen pointed out that B&N's bankruptcy case was still pending as of the day of the hearing, March 16, 2001. His counsel argued, "[s]o there's a question of fact as to was that $50,000 reasonable in light of the value of the claims" that B&N had against Blockbuster and Western International Media Corporation (Western). His counsel argued, "there's still the potential for monies there." The record belies these arguments.

Although normally a question of fact, the commercial reasonableness of the sale of collateral may be determined as a matter of law where the creditor offers prima facie, uncontradicted evidence that the sale was reasonable. *Slaughter v. Ford Motor Credit Co.*, 164 Ga. App. 428, 429 (296 SE2d 428) (1982). To avert summary judgment, the debtor must support his challenge to the sale by presenting evidence of specific facts to show the existence of a genuine issue for trial. See id. Thus, as the responding party, Northen had to offer some competent rebuttal evidence that $50,000 was less than the fair market value of the B&N stock on June 18, 1999, the date of the foreclosure sale. See *Kelly v. Pierce Roofing Co.*, 220 Ga. App. 391, 392-393 (2) (469 SE2d 469) (1996). This Northen failed to do.

Included in the appellate record are copies of two depositions of Northen and two affidavits of Northen, B&N's president and chief executive officer. Both depositions occurred after the foreclosure sale of the B&N stock. At no point in either deposition did Northen testify that the foreclosure price of $50,000 for the B&N stock was unreasonable or not commercially reasonable. In fact, Northen conceded that as of October 11, 2000, B&N had no valuable assets except for its lawsuit against Western.

Nor did Northen in his affidavits specifically contest the reasonableness of the bid of $50,000. The second affidavit filed on March 15, 2001, did not offer any testimony about the value of the foreclosed collateral. As to the first affidavit filed on January 8, 2001, the gist of the testimony was Northen's denial that he had been properly noti-

---

[2] As disclosed in *Northen v. Mary Anne Frolick & Assoc.*, 236 Ga. App. 7 (510 SE2d 857) (1999), the solvency or insolvency of B&N, the ownership interest or lack thereof of Northen in B&N, and Northen's assets or lack thereof were already in dispute in 1997. Northen apparently had told his attorney that B&N was insolvent. Id. at 9. In September 1997, B&N's controller testified that the company's financial situation was "poor." Id. at 10. Our opinion noted "Northen's admitted perjury" and the "inconsistencies in Northen's testimony." Id. at 12 (2).

fied of Raville's election to exercise the repurchase provision, and Northen's claim that he had signed the December 1996 agreement because he thought it was a document to help Raville write off the $1 million for tax purposes.

Northen did however testify as follows: "B&N Company's Stock is worth some amount of money. The Corporation recently settled two of their outstanding lawsuits that were proceeding in Bankruptcy, and received a combined amount of approximately $7,000,000 for those actions." But Northen's testimony that in January 2001, as the result of settling two lawsuits, B&N stock was "worth some amount of money," did not negate the unrefuted evidence that in June 1999, no bidders were willing to undertake the risk of purchasing the B&N stock at the foreclosure sale. Nor could anyone have foreseen that any lawsuit would settle favorably to B&N. The mere fact that a different price may have been paid at a different time for the collateral is not sufficient to establish that the sale did not occur in a commercially reasonable manner. *Farmers Bank*, supra, 247 Ga. at 432. Speculation uttered in January 2001 that the B&N stock was worth "some amount of money" was not legally sufficient to disprove that $50,000 was a commercially reasonable amount at the time of foreclosure. See *Lee v. Trust Co. Bank*, 204 Ga. App. 28, 29 (2) (418 SE2d 407) (1992). The shadowy semblance of an issue is not enough to avoid summary judgment when the evidence clearly shows that only one conclusion can reasonably be drawn. See *Feely v. First American Bank &c.*, 206 Ga. App. 53, 55 (1) (424 SE2d 345) (1992).

Notwithstanding the argument articulated at the hearing, no evidence from the bankruptcy proceeding established a different market value of the shares sold at foreclosure on June 18, 1999. On December 11, 2000, the bankruptcy court approved the settlement of the estate's claim against Western and also Finova Mezzanine Capital, Inc.'s (Finova) claim against the estate. The federal court approved the $6 million settlement of B&N's claims against Western, and Western became obligated to make three payments of $2 million each to the estate. But the order also required the trustee on behalf of B&N's estate to make specified installment payments totaling $2.7 million to Finova. The bankruptcy order provided, "[a]fter making the payments to FINOVA and Court-approved administrative fees and costs described above, the Trustee may pay the allowed claims of general unsecured creditors up to $1,300,000.00 of the last $2,000,000.00 paid by Western." The order also directed:

> With regard to FINOVA's remaining "undersecured" claim (estimated to be in excess of $2,000,000.00, after payment of $2,700,000.00 from the Western settlement), any funds, from any source, remaining in the estate after payment of

the Court-approved administrative fees and costs, including those set forth in subparagraph (c), and the payment of the other general unsecured claims (up to $1,300,000.00) as set forth in subparagraph (d), shall be paid as follows: i. Eighty percent (80%) to FINOVA; and ii. Twenty percent (20%) to any remaining unpaid general unsecured claims.

SRS offered the affidavit of its counsel, Charles M. Cushing, Jr., who testified that "[i]t is highly likely that the settlements approved by the Bankruptcy Court in the Order will be insufficient to cover all the debts of B&N and will net Plaintiff, as a shareholder in B&N nothing at all." Thus, even assuming arguendo that the value of B&N stock in June 1999 could somehow be gleaned from the facts established during the bankruptcy process, we have found no evidence and Northen has not directed our attention to any facts that show that the B&N shares were worth more than $50,000 at the time of foreclosure.

Finally, SRS takes issue with the trial court's finding that a question of fact remained as to whether the disposition of the B&N stock was commercially reasonable "considering the timing of the bankruptcy and the sale." SRS correctly points out that it had no duty to delay foreclosing on the pledged collateral because no Georgia case or statute bars foreclosure on the pledged stock of a company by reason of the company filing for bankruptcy. Under the explicit terms of the parties' agreements, Raville could have foreclosed against the collateral when Northen first defaulted in December 1996 or at any time after Northen again defaulted in June 1998. Although B&N filed bankruptcy, Northen did not do likewise. See, e.g., *Denis v. Delta Air Lines*, 248 Ga. App. 377, 379 (546 SE2d 805) (2001) (when debtor files a Chapter 7 petition, all legal or equitable interests of the debtor in property become part of the bankruptcy estate and title to all property passes to the trustee of the estate). Therefore, B&N's bankruptcy filing had no bearing on the rights of creditors like SRS to seek payment from Northen for his personal debts and obligations.

2. In light of this holding, we need not address SRS's remaining claims of error which are asserted on procedural grounds.

*Judgment reversed. Blackburn, C. J., and Johnson, P. J., concur.*

DECIDED MAY 23, 2002.

*Cushing, Morris, Armbruster & Jones, Charles M. Cushing, Jr., Leticia D. Alfonso*, for appellant.

*Meriwether & Tharp, Patrick L. Meriwether, Robert L. Tharp*, for appellee.