## A96A0756. S K HAND TOOL CORPORATION v. LOWMAN.
(479 SE2d 103)

SMITH, Judge.

Pursuant to our grant of an interlocutory appeal to S K Hand Tool Corporation, we consider whether a professional malpractice affidavit under OCGA § 9-11-9.1 is required for a claim of strict liability under OCGA § 51-1-11.

Viewing the evidence on S K's motion to dismiss or for summary judgment in favor of Lowman under *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991), the evidence was that Lowman worked for a landscaper as a mechanic in charge of servicing equipment. While attempting to reattach a sharpened lawnmower blade to a mower, he was using a ratchet designed and manufactured by S K. As he was pressing on the ratchet to tighten a nut, it slipped, causing him to cut his hand on the blade.

In his complaint, Lowman alleged that "[t]he ratchet was defective within the meaning of OCGA § 51-1-11. It was not reasonably suited for the purpose for which it was manufactured. . . . The ratchet was defective in that it did not remain secure when pressure was applied to tighten the nut. Either the teeth or gears slipped, or broke off when pressure was applied to the handle of the ratchet." He also alleged that S K "expressly or impliedly warranted the ratchet as being fit for the ordinary and particular purpose for which it was to be used"; that the ratchet "was not merchantable for the purpose for which it was sold"; and that S K "failed to exercise even ordinary care and diligence in what they knew, or should have known, to be a defective product."

S K answered the complaint and subsequently filed a motion to dismiss or for summary judgment based on failure to file an expert affidavit under OCGA § 9-11-9.1 (e). The trial court reviewed the depositions, including that of James Hills, a professional engineer retained by Lowman, and denied summary judgment. The trial court concluded that "because it is unclear to Mr. Hills, an engineer stipulated as an expert by [S K], whether improper engineering or improper installation of the shift pin or improper manufacturing caused the ratchet to malfunction, it cannot be said as a matter of law that this is a case of negligent design which would require the filing of an affidavit in accordance with OCGA § 9-11-9.1." We affirm.

S K maintains that the primary issue in this case is the design of the ratchet, relying in large part on Lowman's discovery request for a copy of the ratchet's design and interrogatories concerning the ratchet's design. Also in this regard, S K references the deposition testimony of Lowman's expert engineer that the ratchet malfunctioned due to improper design of an internal pin. S K specifically notes the engineer's testimony that, "[a]ll I got to say is S K Hand

Tool engineered it wrong." Based on the authority of *Kneip v. Southern Engineering Co.*, 260 Ga. 409 (395 SE2d 809) (1990); *Jackson v. Dept. of Transp.*, 201 Ga. App. 863 (412 SE2d 847) (1991); and *Adams v. Coweta County*, 208 Ga. App. 334 (430 SE2d 599) (1993), S K argues that because the affidavit requirement applies to a complaint alleging damages as a result of engineering services, and because engineering services were involved in the design and manufacture of the ratchet, Lowman was required to file an expert affidavit in support of his strict liability claim.

In *Kneip*, our Supreme Court held that the expert affidavit requirement of OCGA § 9-11-9.1 (a) applies to the engineering profession. There, plaintiff sued defendant, who was under contract to perform engineering services that included inspection of utility poles, alleging that defendant negligently inspected a pole, causing it to deteriorate and fall. Id. at 410 (3). Based on these allegations and discovery revealing that plaintiff intended to call expert witnesses to testify at trial, the Supreme Court held that plaintiff was required to attach to its complaint an expert affidavit pursuant to OCGA § 9-11-9.1 (a). Citing *Kneip*, this Court in *Jackson* and *Adams*, supra, concluded that designing roads, bridges, and guardrails requires engineering services and that such services are professional ones " 'within the purview of OCGA § 9-11-9.1.' " *Adams* at 335-336; *Jackson* at 865.

S K argues that just as the design of a road requires engineering services, the design of a ratchet or any other hand tool necessarily requires engineering services, and an expert affidavit is thus required. But Lowman's complaint did not actually allege defective design of the ratchet. Even assuming that Lowman's discovery revealed that the central issue here concerns the design of the ratchet, we are not persuaded by S K's argument that *Kneip*, *Jackson*, and *Adams* mandate the filing of an expert affidavit here. Those cases are factually distinguishable; the claims did not sound in strict liability against the manufacturer of a product, as does the claim at issue here.

More importantly, the conclusion urged by S K is inconsistent with fundamental differences between claims alleging professional negligence and those alleging strict liability. A professional negligence claim depends upon "the existence or absence of allegations that the defendant-professional has rendered negligent professional services." *Jordan, Jones & Goulding, Inc. v. Wilson*, 197 Ga. App. 354, 355 (1) (398 SE2d 385) (1990). The plaintiff must prove that a professional breached the duty "to exercise a reasonable degree of skill and care, as determined by the degree of skill and care ordinarily employed [by other professionals] under similar conditions and like surrounding circumstances. [Cits.]" (Emphasis omitted.) *Allen v.*

*Lefkoff &c. P. C.*, 265 Ga. 374, 375 (2) (a) (453 SE2d 719) (1995). OCGA § 9-11-9.1 imposes on such claims a threshold pleading requirement that the plaintiff "show at the outset" that his or her suit is not frivolous. "This serves to prevent putting a professional to great expense and adversely affecting his or her professional reputation unjustifiably. . . . It simply contemplates that parties allegedly damaged by malpractice show up front, by expert's affidavit, that they have some evidence of malpractice, which by its nature can be established only by professional or expert testimony." (Citations and punctuation omitted.) *Johnson v. Brueckner*, 216 Ga. App. 52, 53 (453 SE2d 76) (1995).

Strict liability, on the other hand, places "a burden on the manufacturer who markets a new product to take responsibility for injury to members of the consuming public for whose use and/or consumption the product is made." *Robert F. Bullock, Inc. v. Thorpe*, 256 Ga. 744, 745 (353 SE2d 340) (1987). See also *Alexander v. General Motors Corp.*, 219 Ga. App. 660, 662 (466 SE2d 607) (1995), rev'd on other grounds, 267 Ga. 339 (478 SE2d 123) (1996). A claim of strict liability is not proved by reference to "a reasonable degree of skill and care" as measured against a certain community; the nature of a strict liability claim is not that *services* were negligently provided. The basis of such a claim is that a product when sold was defective; it "was not merchantable and reasonably suited to the use intended, and its condition when sold is the proximate cause of the injury sustained." OCGA § 51-1-11 (b) (1); *Center Chemical Co. v. Parzini*, 234 Ga. 868, 869 (2) (218 SE2d 580) (1975). In a case alleging strict liability, the questions for jury resolution therefore are whether a product was defective, and if so, whether the defect was the proximate cause of a plaintiff's injury. See *Firestone Tire &c. Co. v. Pinyan*, 155 Ga. App. 343, 350 (5) (270 SE2d 883) (1980).

In this case, Lowman's strict liability claim contains no allegation that professional services were negligently provided. Instead, the claim is a classic one of strict liability against the manufacturer of a product — that Lowman suffered injury proximately resulting from the manufacture of a defective product. S K nevertheless seeks to engraft an expert affidavit pleading requirement on Lowman's strict liability claim, relying on *Banks v. ICI Americas,* 264 Ga. 732 (450 SE2d 671) (1994).

The Supreme Court in *Banks* formulated a standard for the trier of fact to use in determining defectiveness in design defect cases under a strict liability cause of action. The court identified three types of product defects — manufacturing, design, and marketing/packaging defects, id. at 733 — and defined a test for use in determining whether a product is defectively designed. It adopted a "risk-utility" test, setting out a non-exhaustive list of factors for a jury to

consider in a balancing analysis of whether a product is defective.[1] The Court stated that this is "consistent with Georgia law, which has long applied negligence principles in making the determination whether a product was defectively designed." Id. at 735. Similarly, the Court "recognize[d] that the determination of whether a product was defective (involving the reasonableness of a manufacturer's design decisions), which is a basic inquiry for strict liability purposes, generally will overlap the determination of whether the manufacturer's conduct was reasonable, which is a basic inquiry for negligence purposes." Id. at 735, n. 3. *Banks* does seem to blur the distinction Georgia cases have historically made between negligence and strict liability claims. See, e.g., *Firestone Tire v. Pinyan*, supra, at 350 ("[W]hether or not the factors proximately resulting in the injuries were or were not acts of negligence *is of no bearing or consequence* in a strict liability case." (Emphasis supplied.)).

The Supreme Court, however, in fashioning its risk-utility analysis cannot have intended the result urged by S K. Blurred distinctions and overlapping principles notwithstanding, the Supreme Court in *Banks* recognized — and upheld — a distinction between strict liability and negligence theories: "[W]e cannot agree that the use of negligence principles to determine whether the design of a product was 'defective' necessarily obliterates under every conceivable factual scenario the distinction Georgia law has long recognized between negligence and strict liability theories of liability." *Banks,* supra at 735, n. 3. Since *Banks*, this Court has continued to honor that distinction. See, e.g., *Alexander*, supra at 662 (public policy in Georgia of shifting burden caused by defective product to manufacturer "by focusing not on whether the manufacturer negligently failed to use due care but on whether the marketed product was defective. [Cits.]"). Furthermore, *Banks* does not state that the standard to be applied in a risk-utility analysis somehow relates to whether a "reasonable degree of skill and care" was employed in a product's design, nor does it recite that the risk-utility analysis concerns the breach of a minimum standard of care such that expert testimony is required. Instead, *Banks* simply requires the balancing of several factors which relate to the risks and benefits of products, and no one factor alone is a prerequisite for bringing a claim.

---

[1] The Supreme Court announced that a central factor to be considered in a risk-utility analysis is the availability of an alternative safer design. *Banks* at 733. It is important to note, however, that despite the court's recitation that the reasonableness of choosing the safest design from alternative designs is the "heart" of design defect cases, id. at 736, the court did not hold that a jury *must* consider this factor. The Supreme Court instead held that the jury "*may* consider evidence establishing that at the time the product was manufactured, an alternative design would have made the product safer than the original design and was a marketable reality and technologically feasible." Id.

Simply put, a claim for professional malpractice depends upon negligence principles — standards of reasonableness as related to professional services. A claim for strict product liability — whether the problem is manufacture or design — depends, however, upon whether a product was defective. While negligence principles may now be utilized in the determination of whether a product was defectively designed, a viable distinction nonetheless remains between claims alleging strict liability and those alleging provision of negligent professional services. Because the purposes of and inquiries inherent in claims alleging professional negligence and those alleging strict liability differ substantially, the extra pleading requirement imposed on professional malpractice claims is not equally applicable to claims of strict liability.

*Judgment affirmed. Beasley, C. J., McMurray, P. J., Birdsong, P. J., Pope, P. J., Johnson, Blackburn and Ruffin, JJ., concur. Andrews, J., dissents.*

ANDREWS, Judge, dissenting.

While I concur with the majority to the extent it can be read to allow the assertion of a strict liability claim premised on simple negligence, because I believe that the affidavit requirement applies to strict liability cases when they are premised upon a defect in a product which is the result of the exercise of professional judgment in the initial design of the product or in the design of the manufacturing process for the product, I respectfully dissent as to that portion of the majority.

1. OCGA § 9-11-9.1 requires that "[i]n any action for damages alleging professional malpractice, the plaintiff shall be required to file with the complaint an affidavit of an expert competent to testify, which . . . shall set forth specifically at least one negligent act or omission claimed to exist and the factual basis for each such claim." (Enacted by Ga. L. 1987, p. 887, § 3.)

(a) OCGA § 9-11-9.1 is an initial pleading requirement, *Hewett v. Kalish*, 264 Ga. 183, 184 (1) (442 SE2d 233) (1994), which " 'applies to any action for professional malpractice by negligent act or omission, sounding in tort or by breach of contract for failure to perform professional services in accordance with the professional obligation of care.' [Cit.]" *Housing Auth. of Savannah v. Greene*, 259 Ga. 435, 436 (1) (383 SE2d 867) (1989). See also *Whitley v. Gwinnett County*, 221 Ga. App. 18, 19 (1) (470 SE2d 724) (1996); *Adams v. Coweta County*, 208 Ga. App. 334, 335 (2) (430 SE2d 599) (1993). This requirement is an exception to the general liberality of the Civil Practice Act, *Redmond v. Shook*, 218 Ga. App. 477, 478 (2) (462 SE2d 172) (1995), even though any affidavit filed is to be construed most favorably to the plaintiff. *Gadd v. Wilson & Co.*, 262 Ga. 234, 235 (416 SE2d 285)

(1992).

An affidavit is required when the allegations of liability are against a person or entity which is not a "professional," but the allegations are "grounded upon the averment of acts or omissions requiring the exercise of professional skill and judgment by agents or employees who themselves are recognized as 'professionals' . . ." *Dozier v. Clayton County Hosp. Auth.*, 206 Ga. App. 62, 65 (3) (424 SE2d 632) (1992). See also *Ga. Physical Therapy v. McCullough*, 219 Ga. App. 744, 746 (466 SE2d 635) (1996); *Howard v. City of Columbus*, 219 Ga. App. 569, 572 (2) (466 SE2d 51) (1995); *Robinson v. Medical Center &c.*, 217 Ga. App. 8, 10 (456 SE2d 254) (1995).

Engineering is one of the professions to which the section applies if the claim made is one arising from the performing of engineering services. *Kneip v. Southern Engineering Co.*, 260 Ga. 409 (2) (395 SE2d 809) (1990) (involving a claim of negligent inspection of a utility pole by an engineering firm).

(b) The applicability of the affidavit requirement is determined by considering the allegations of the complaint as the primary touchstone, cf. *McGarr v. Gilmore*, 220 Ga. App. 286, 287 (469 SE2d 720) (1996), but matters developed by a plaintiff's discovery may also be considered. *Adams*, supra at 336 (2).

Since the motion here was styled as one to dismiss or for summary judgment, all discovery of record is considered in evaluating the trial court's determination.

(c) In analyzing the complaint, OCGA § 9-11-8 (e) (2) is also relevant. It allows a party to "set forth two or more statements of a claim . . . alternatively or hypothetically, either in one count . . . or in separate counts. . . . A party may also state as many separate claims . . . as he has, regardless of consistency and whether based on legal or on equitable grounds or on both."

2. OCGA § 51-1-11 (b) (1) imposes liability in tort upon "[t]he manufacturer of any personal property sold as new property . . . to any natural person . . . injur[ed] . . . because the property when sold by the manufacturer was not merchantable and reasonably suited to the use intended, and its condition when sold is the proximate cause of the injury. . . ." (This language originated in Ga. L. 1968, pp. 1166, 1167. See *Stiltjes v. Ridco Exterminating Co.*, 256 Ga. 255, 256 (347 SE2d 568) (1986); *Ford Motor Co. v. Carter*, 239 Ga. 657, 659 (238 SE2d 361) (1977); *Ellis v. Rich's, Inc.*, 233 Ga. 573 (212 SE2d 373) (1975), for a history of the development of this concept in this state.)

"There are three general categories of product defects: manufacturing defects, design defects, and marketing/packaging defects. [Cit.] . . . [*Center Chemical Co. v.*] *Parzini*[, 234 Ga. 868 (218 SE2d 580) (1975)] addressed manufacturing and packaging defects and did

not recognize the existence of design defects, i.e., those cases where it is not possible to ascertain whether a product is 'defective' by simply comparing it to a properly manufactured item from the same product line. [Cit.] . . . Unlike a manufacturing defect case, wherein it is assumed that the design of the product is safe and had the product been manufactured in accordance with the design it would have been safe for consumer use, in a design defect case the entire product line may be called into question and there is typically no readily ascertainable external measure of defectiveness. It is only in design defect cases that the court is called upon to supply the standard for defectiveness: the term 'defect' in design defect cases is an expression of the legal conclusion to be reached, rather than a test for reaching that conclusion. [Cit.]" *Banks v. ICI Americas*, 264 Ga. 732, 733-734 (1) (450 SE2d 671) (1994) (adopting the "risk-utility" analysis as the appropriate test for legally concluding a product's design specifications were partly or totally defective).

The risk-utility analysis "incorporates the concept of 'reasonableness,' i.e., whether the manufacturer acted reasonably in choosing a particular product design, given the probability and seriousness of the risk posed by the design, the usefulness of the product in that condition, and the burden on the manufacturer to take the necessary steps to eliminate the risk. . . . Conceptually and analytically, this approach bespeaks negligence. [Cit.] The balancing test that forms the risk-utility analysis is thus consistent with Georgia law, which has long applied negligence principles in making the determination whether a product was defectively designed. [Cit.]" *Banks*, supra at 734-735.

While the Supreme Court, in *Banks*, saw no reason to conclude "definitively that the two theories [strict liability and negligence] merge in design defect cases[,] [cits.]," that court did recognize that "the determination of whether a product was defective (involving the reasonableness of a manufacturer's design decisions), which is a basic inquiry for strict liability purposes, generally will overlap the determination of whether the manufacturer's conduct was reasonable, which is a basic inquiry for negligence purposes." *Banks*, supra at 735, fn. 3. See also *Wilson Foods v. Turner*, 218 Ga. App. 74, 75 (1) (460 SE2d 532) (1995); *Ream Tool Co. v. Newton*, 209 Ga. App. 226, 228 (4) (433 SE2d 67) (1993).

3. As stated in his Statement of Material Facts for Trial, Lowman's contention is that the ratchet ". . . either [was not] manufactured properly [wrong dimensions used in manufacturing] or [the pin] wasn't pushed into the hole properly, or, the design of it was such that even if it was manufactured properly that the pin's dimensions were such that it would come out."

To the extent that Lowman's complaint can be construed as

alleging strict liability for the production of the ratchet based on professional malpractice by S K's engineers because of the design of the ratchet, I believe it was subject to OCGA § 9-11-9.1. *Lutz v. Foran*, 262 Ga. 819, 820 (2) (427 SE2d 248) (1993); *Seely v. Loyd H. Johnson Constr. Co.*, 220 Ga. App. 719, 723 (3) (470 SE2d 283) (1996); *Whitley*, supra. Similarly, to the extent that the complaint alleges strict liability based on the ratchet being improperly manufactured, i.e., that the method of manufacturing the ratchet did not comply with the standards of professional engineering, I believe an affidavit was required. See *Raley v. Terminix Intl.*, 215 Ga. App. 324, 325 (450 SE2d 343) (1994).

This conclusion is supported by the depositions of Hills, Lowman's expert, and Paeth, S K's Manager of Product Engineering. Attached to their depositions are copies of the engineering drawings of the subject ratchet. The ratchet consists of a handle, an innerbody assembly, a cap screw, a reversing cap, a heart shaped spring, a grooved shift pin located in the recessed area inside the spring, a standard ball bearing, and a pawl.[2] Paeth, a member of the Hand Tool Institute Committee of the American Society of Mechanical Engineers, identified the ANSI[3] Standards applicable to this ratchet.

S K had two engineering divisions. Product engineering was responsible for development of a product new to S K as well as creation of a new product which might be new to the industry. The manufacturing engineering division was responsible for "the processes to make the part" that Paeth designed.

The ratchet was first introduced by S K in 1988 and, since that time, changes in the design have been noted in the "Engineering Change Notices" on the drawings. S K designed the cap and used the pawl and spring design of its parent company, a foreign tool manufacturer.

As component parts not manufactured by S K were received, they were checked against the drawings by lot sample. A torque test was performed "to failure" on the inner body, also by lot sample, after the parts were heat treated.

Both Hills and Paeth agreed that the shift pin should not come out of the hole in which it is installed. The shift pin served to shift the pawl device and put pressure on it, causing it to engage the inside of the teeth in the socket head, allowing the ratchet to be used.

---

[2] A hinged or pivoted device adapted to fit into a notch of a ratchet wheel to impart forward motion or prevent backward motion. American Heritage Dictionary 911 (2nd College ed. 1985).

[3] ANSI is the American National Standards Institute which is chartered by ASME. *Cobb County School Dist. v. MAT Factory*, 215 Ga. App. 697, 698, fn. 1 (452 SE2d 140) (1994).

Paeth opined that the ratchet had been disassembled by someone and improperly reassembled, causing the pin to loosen. He further opined that, if the hole into which the pin was inserted was too large, causing the pin to dislodge, that was due to wear, not improper design or mismanufacture.

Hills opined that "it was either not manufactured properly, that is, it was either to the wrong dimensions or it wasn't pushed in the hole properly or wasn't seated properly, or the design of it was such that even if it was manufactured right the dimensions were such that it would come out. And that's the reason I put both design and manufacture. . . ." Hills noted that a change was made in Drawing A 45175-PB after the subject ratchet was manufactured. This caused him "to think there must have been a problem with this diameter and this length that caused them to change it." The drawings indicated to him that "they changed the length of the pin and the depth of the hole that the pin goes in."

These observations were obviously made by Hills and Paeth based on their expertise as professional engineers and dealt with the presence or absence of professional malpractice in either the design or manufacture of the ratchet. While Lowman is correct that the cause of the ratchet's failure was the looseness of the pin in its hole, which was obvious once the ratchet was disassembled, the reason the pin was loose required the exercise of professional judgment, based on engineering standards.

4. I note that the affidavit required "has 'a lesser evidentiary standard to meet when used to fulfill the requirement of OCGA § 9-11-9.1 (a),' than when also relied upon as expert testimony to create genuine issues of material fact in the disposition of a motion for summary judgment. [Cit.]" *Dozier,* supra at 66 (4). All that is required is a synopsis of the salient facts upon which the expert bases his opinion and may contain conclusions and hypotheticals based on assumed facts. See *Hewett v. Kalish,* 264 Ga. 183, 184 (442 SE2d 233) (1994); *Howard,* supra at 573 (3). It is sufficient if " 'construing it most favorably for (plaintiff) and resolving all doubts in [his] favor, it constitutes an affirmation that (plaintiff's) complaint is not frivolous and that, if true, the allegations therein would authorize a recovery for an injury resulting from [defendant's] malpractice.' [Cit.]" *Fidelity Enterprises v. Beltran,* 214 Ga. App. 205, 206 (447 SE2d 150) (1994).

An opinion that "another specified design 'might' have been used and that the failure to use such a design or another appropriate alternative constituted malpractice is sufficient to set forth a negligent act or omission as required by the affidavit statute." *Samuelson v. Lord, Aeck & Sergeant,* 205 Ga. App. 568, 570 (1) (423 SE2d 268) (1992) (site design for a post office).

Therefore, I believe that S K was entitled to summary judgment

on the strict liability claim so far as that claim was premised on a design defect or a defect in the engineering of the manufacturing process because of failure to comply with OCGA § 9-11-9.1.

DECIDED DECEMBER 3, 1996 —

*Swift, Currie, McGhee & Hiers, Stephen L. Cotter, Robin F. Clark*, for appellant.

*The Groover Firm, David C. Cole, James L. Ford*, for appellee.

*Brown & Shamp, Robert H. Brown III, Craig T. Jones, David W. Boone*, amici curiae.

