### A03A0661. BRYANT et al. v. HOFFMANN-LA ROCHE, INC.
(585 SE2d 723)

ADAMS, Judge.

Clyde C. Bryant filed suit against Hoffmann-La Roche, Inc. in his capacity as executor of the estate of his late wife, Carolyn Bryant, as well as on his own behalf. Hoffmann-La Roche is a pharmaceutical manufacturer, and Bryant's suit arose out of his wife's use of Posicor, one of the company's products.[1]

In 1997, Carolyn Bryant was being treated for cardiac problems, including hypertension and atrial fibrillation, by Dr. Harold D. Carlson. In connection with that treatment, Carlson prescribed a number of medications for Mrs. Bryant, including Betapace, a beta blocking drug. On August 18, 1997, Dr. Carlson increased the Betapace dosage, and on August 25, he prescribed Posicor, a heart medication that Hoffmann-La Roche had recently placed on the market. Posicor is a calcium channel blocker medication used to treat high blood pressure and angina. On August 26, 1997, Mrs. Bryant took the Betapace at approximately 7:00 a.m., and again at noon, and took Posicor for the first time at approximately 10:00 a.m. that day. That afternoon, her husband found her at the bottom of the stairs in her home, and it was later determined that she had suffered severe brain injuries.

Bryant subsequently brought this suit asserting claims of negligence, breach of warranty, strict liability, and loss of consortium against Hoffmann-La Roche and alleging that his wife's injuries were linked directly to the use of Posicor and its interaction with Betapace. The trial court, without explanation, granted Hoffmann-La Roche's motion for summary judgment as to all of Bryant's claims, and Bryant appeals that ruling as well as the trial court's order granting Hoffmann-La Roche's motions in limine to exclude the testimony of his expert witnesses.

1. As an initial matter, we must address Hoffmann-La Roche's argument that Bryant's claims are preempted by federal law. The company asserts that Bryant's allegations actually set forth a claim that Hoffmann-La Roche committed fraud upon the Food and Drug Administration in submitting Posicor for approval, and that claim is preempted by federal law under the authority of *Buckman Co. v.*

---

[1] His lawsuit also asserted claims against Harold D. Carlson, M.D.; Premier Medical Group of Atlanta, P.C.; and Cardiac Disease Specialists, P.C.

*Plaintiffs' Legal Committee*, 531 U. S. 341 (121 SC 1012, 148 LE2d 854) (2001). Hoffmann-La Roche bases its argument on Bryant's allegations that the company rushed Posicor to market without fully testing the product.

In *Buckman*, the plaintiffs actually asserted a fraud on the FDA claim, and the United States Supreme Court held that preemption applied because "the existence of . . . federal enactments is a critical element" of the claim. 531 U. S. at 353. And the Court noted the claim arose "solely by virtue" of the disclosure requirements of the Food, Drug, and Cosmetic Act. 52 Stat. 1040, as amended by the Medical Device Amendments of 1976, 90 Stat. 539, 21 USC § 301 (1994 ed. and Supp. V). Id. Thus, we would agree that to the extent that Bryant's claims could be construed as asserting a fraud-on-the-FDA claim or a claim arising solely by virtue of federal law, such claims would be preempted.

But Bryant does not assert a fraud claim or a violation of federal law; rather he asserts that Hoffmann-La Roche violated duties arising under state statutory and common law. And we do not construe *Buckman* as holding that such claims are preempted. The U. S. Supreme Court, in fact, drew a distinction between the fraud-on-the-agency claim asserted in that case and its prior decisions involving "traditional state law tort principles" that were not subject to preemption. See *Buckman Co.*, 531 U. S. at 352-353 (distinguishing *Silkwood v. Kerr-McGee Corp.*, 464 U. S. 238 (104 SC 615, 78 LE2d 443) (1984), and *Medtronic, Inc. v. Lohr*, 518 U. S. 470 (116 SC 2240, 135 LE2d 700) (1996)). Accordingly, Hoffmann-La Roche was not entitled to summary judgment on the basis of preemption. See also *Lance v. American Edwards Laboratories*, 215 Ga. App. 713, 715-716 (452 SE2d 185) (1994) (FDCA and MDA do not preempt state strict liability and negligence claims arising from use of medical device); *Caraker v. Sandoz Pharmaceuticals Corp.*, 172 FSupp.2d 1018 (S.D. Ill. 2001) (for a comprehensive discussion of preemption in this context after *Buckman* and holding that state law claims for pharmaceutical design defect, failure to warn, and negligence claims are not preempted by federal law).

2. Bryant asserts that the trial court erred in granting summary judgment on his strict liability claims because he asserts that there are factual issues as to whether Posicor was a defective drug, whether it had a design defect, and whether Hoffmann-La Roche issued inadequate warnings for the drug. Hoffmann-La Roche asserts, however, that pharmaceutical manufacturers should be exempt from liability for design defects. Hoffmann-La Roche further argues that if this Court determines that a claim for pharmaceutical design defect can exist, we should adopt a special standard of strict liability for drug manufacturers that would insulate them from

claims for design defect unless the plaintiff can show that the drug was not suitable for any class of patients.

To date, no Georgia case has specifically addressed the issue of design defects in the context of pharmaceutical products. And our review of the case law from other jurisdictions demonstrates that the treatment of design defect claims for prescription drugs varies widely among the states to have considered the issue.

Hoffmann-La Roche argues that in the absence of prior Georgia authority, we should follow the approach of the California Supreme Court holding that prescription drug manufacturers are insulated from all design defect claims. *Brown v. Superior Court &c. of San Francisco*, 44 Cal.3d 1049 (751 P2d 470) (1988). In reaching that conclusion, the California court relied upon Comment k to § 402A of the Restatement (Second) of Torts. Id. at 1061. That comment provides:

> There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. . . . Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it unreasonably dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.

(Emphasis omitted.) The California court interpreted this provision as providing that no prescription drug manufacturer can ever be strictly liable for design defect, but could only be liable for negligent

manufacturing defects and for failure to warn of known or reasonably knowable side effects. *Brown*, 44 Cal.3d at 1069, n. 12.

In support of this interpretation, the California Supreme Court noted:

> If drug manufacturers were subject to strict liability, they might be reluctant to undertake research programs to develop some pharmaceuticals that would prove beneficial or to distribute others that are available to be marketed, because of the fear of large adverse monetary judgments.

*Brown*, 44 Cal.3d at 1063.

But the *Brown* decision reflects the minority view among those jurisdictions to have considered the language of Comment k.[2] See Winchester, Note: Section 8 (c) of the Proposed Restatement (Third) of Torts: Is It Really What the Doctor Ordered?, 82 Cornell L. Rev. 644, 655 (1997). Most of the states that have adopted Comment k have applied it in a more limited fashion and on a case-by-case basis. See *Freeman v. Hoffmann-La Roche, Inc.*, 260 Neb. 552, 560-563 (IV) (1) (a) (ii) (618 NW2d 827) (2000); *Tansy v. Dacomed Corp.*, 890 P2d 881, 886, n. 2 (Okla. 1994). And most of those jurisdictions have held that a risk-utility analysis must be conducted before Comment k will bar recovery under products liability. *Tansy*, 890 P2d at 886.

The cases that have taken this approach have determined that Comment k requires that the benefits of the product must outweigh its known risks on the date the product is distributed before the manufacturer can avoid strict liability. *Adams v. G. D. Searle & Co.*, 576 S2d 728, 733 (Fla. App. 1991). This application of Comment k also includes a consideration of whether the risks were unavoidable, that is whether at the time of manufacture and distribution there was any "feasible alternative design which on balance accomplishe[d] the subject product's purpose with a lesser risk." *Toner v. Lederle Laboratories*, 112 Idaho 328, 337 (732 P2d 297) (1987). In addition, Comment k, by its own terms, provides protection against strict liability only where the product is "properly prepared, and accompanied by proper directions and warning." Thus, it does not apply to claims of manufacturing defect or failure to warn. Id. at 336.

Courts adopting this approach have determined that a case-by-case application of Comment k's exemption from strict liability does not undercut the public policy concerns surrounding the development

---

[2] The other states adopting California's approach are Washington, *Young v. Key Pharmaceuticals*, 130 Wn.2d 160 (922 P2d 59) (Wash. 1996), and Utah, *Grundberg v. Upjohn Co.*, 813 P2d 89 (Utah 1991).

of new and beneficial medications. One court noted that this approach

> will encourage, rather than discourage, improvements in prescription products. . . . Thus, a product which is as safe as current testing and research permits should be protected. The reverse is also true; a product which is not as safe as current technology can make it should not be protected. [Cits.]

*Adams*, 576 S2d at 732. See also *Toner*, 112 Idaho at 337 (society's interests not served by unavoidably unsafe product with limited benefit that is predominantly detrimental to public safety).

Hoffmann-La Roche does not address the risk-utility analysis under Comment k, instead arguing that there should be no strict liability for pharmaceutical design defects. But the company asserts that if this Court finds that such a claim exists, we should adopt the approach set forth in § 6 (c) of the Restatement (Third) of Torts (1997). That provision reads:

> A prescription drug or medical device is not reasonably safe due to defective design if the foreseeable risks of harm posed by the drug or medical device are sufficiently great in relation to its foreseeable therapeutic benefits that reasonable health-care providers, knowing of such foreseeable risks and therapeutic benefits, would not prescribe the drug or medical device for any class of patients.

Comment b to § 6 explains that under subsection (c), "a drug is defectively designed *only* when it provides *no* net benefit to any class of patients." (Emphasis supplied.)

The Third Restatement was intended as "a complete overhaul" of the Second Restatement in the area of product liability, and it represents a dramatic change from the product liability provisions of the Second Restatement. *Freeman*, 260 Neb. at 563-564 (IV) (1) (b). See also Conk, Is There a Design Defect in the Restatement (Third) of Torts: Products Liability?, 109 Yale L. J. 1087, 1103-1104 (2000). These changes have garnered substantial criticism. See, e.g., Arnold, Note: Rethinking Design Defect Law: Should Arizona Adopt the Restatement (Third) of Torts: Products Liability?, 45 Ariz. L. Rev. 173, 187 (Spring 2003); Vandall, Constructing a Roof Before the Foundation is Prepared: The Restatement (Third) of Torts: Products Liability Section 2 (b) Design Defect, 30 U. Mich. J. L. Reform 261 (1997). In particular, § 6 (c) has been criticized for its failure to reflect existing case law, its lack of flexibility with regard to drugs involving differing benefits and risks, its unprecedented application

of a reasonable physician standard, and the fact that a consumer's claim could easily be defeated by expert opinion that the drug had some use for someone, despite potentially harmful effects on a large class of individuals. *Freeman*, 260 Neb. at 566-569. To date, no court has adopted the Third Restatement's strict liability test for prescription drugs, and one court has explicitly refused to adopt the test. *Freeman*, 260 Neb. at 564-565.[3]

Because we find nothing in our prior case law that would authorize the adoption of such a stringent test for prescription drugs or any other product, we decline to adopt the standard set forth in § 6 (c). Nor do we believe that existing Georgia product liability law would encompass the minority rule insulating all prescription drugs from strict liability. Rather, we find that the risk-benefit analysis comports with our Supreme Court's determination that claims for design defect are to be evaluated under a risk-utility analysis "balancing the risks inherent in a product design against the utility of the product so designed." *Banks v. ICI Americas, Inc.*, 264 Ga. 732, 735 (1) (450 SE2d 671) (1994). Moreover, we agree with the majority of courts that Comment k serves as an affirmative defense and that the defense has no application to claims of manufacturing defect or failure to warn. *Freeman*, 260 Neb. at 562-564; *Tansy*, 890 P2d at 885.

Thus, once a prima facie case for design defect is established, we hold that a pharmaceutical manufacturer will be relieved from strict liability only when it demonstrates that it has met the requirements of Comment k, that is, when it demonstrates that "(1) the product is properly manufactured and contains adequate warnings, (2) its benefits justify its risks, and (3) the product was at the time of manufacture and distribution incapable of being made more safe." *Freeman*, 260 Neb. at 568. See also *Tansy*, 890 P2d at 886.

3. Before we can determine whether an issue of fact exists as to Bryant's strict liability claims, however, we must first address the trial court's decision to exclude all of the testimony of Bryant's expert witnesses. The trial court provided no basis for its decision.

Bryant presented the testimony of Dr. Samuel Dudley and Dr. Michael Kell on the following issues: (1) whether Mrs. Bryant's injuries were due to a form of ventricular tachycardia, known as Torsades des Pointes; (2) whether her use of Posicor was a proximate

---

[3] We note that in urging the adoption of the § 6 (c) test, the concurrence relies upon the existence of FDA testing before a drug is brought to market. However, Georgia courts have previously held, in the context of automobile manufacturing, that compliance with federal safety standards "does not render a manufacturer's choice of design immune from liability." *Doyle v. Volkswagenwerk Aktiengesellschaft*, 267 Ga. 574, 577 (481 SE2d 518) (1997). Rather, it is but one factor to be considered under the risk-utility analysis.

cause of her episodes of Torsades des Pointes; (3) whether Hoffmann-La Roche failed to conduct adequate research on Posicor with regard to the safety issues; (4) whether Posicor masks the effects of other drugs on the heart rhythm; and (5) whether Hoffmann-La Roche's warnings for Posicor were inadequate.

Dr. Dudley is a graduate of the Medical College of Virginia, where he received a medical degree and a Ph.D. in physiology and cardiac electrophysiology. He is board-certified in medicine and in cardiovascular disease. Dr. Dudley teaches drug antiarrhythmic pharmacology and cellular electrophysiology at Emory University Medical School, and is the Chief of the cardiology division at the Atlanta Veterans Administration Medical Center. He has also authored numerous articles on electrophysiology.

Dr. Kell holds a master's degree in chemical engineering from Massachusetts Institute of Technology. He received his medical degree and Ph.D., concentrating in cardiac physiology, under a joint program between Emory and the National Institutes of Health. He stated that his practice consists of treating patients with a variety of medical problems, including the practice of medication management, the treatment of heart conditions, toxicology, and the care of the elderly. He stated that he also conducts research on various medications and their effects on patients.

Although the motions in limine appear to address the doctors' entire testimony, Hoffmann-La Roche's primary argument is that neither physician is qualified to opine as to the extent or adequacy of the testing and evaluation performed on Posicor before it was marketed. The company notes that neither physician has any specific training or experience with the regulatory requirements of obtaining FDA approval of a drug and further takes issue with the amount of materials the experts reviewed in connection with Posicor's FDA approval.

"A witness with such skill, knowledge, or experience in a field or calling as to be able to draw an inference that could not be drawn by the average layperson may be qualified as an expert witness." *Evans v. State*, 259 Ga. App. 9, 11 (3) (576 SE2d 27) (2002). And qualification as an expert does not depend upon formal education alone; a person may be qualified as an expert when his or her knowledge is derived from experience as well as study. *Taylor v. State*, 261 Ga. 287, 290 (1) (a) (404 SE2d 255) (1991). The decision to admit or exclude expert testimony falls within the sound discretion of the trial court. *Sims v. Heath*, 258 Ga. App. 681, 682 (1) (577 SE2d 789) (2002).

Based upon our review of the record, we cannot say that the trial court clearly abused its discretion in excluding the doctors' testimony on the issue of the adequacy of Posicor's testing and evaluation to the extent that it relates to whether the FDA should have approved

Posicor. But Bryant asserts claims for strict liability and negligent design defect, which, as we have held, are independent of the FDA requirements. In fact, it is generally recognized that FDA requirements present only minimum standards, and that state law may impose a higher obligation of care upon a drug manufacturer. *Caraker*, 172 FSupp.2d at 1033, n. 11.

In connection with those claims, the doctors opined that had Hoffmann-La Roche conducted certain tests, the company would have detected flaws in Posicor's design. From our review of the record, therefore, it appears that this portion of the doctors' testimony fell within their areas of expertise and was relevant to the claims at issue. We note, for example, that Dr. Dudley testified that he had been involved in several pre-market clinical trials for drugs in connection with drug development.

Thus, we find that it was an abuse of discretion to exclude the remainder of the experts' testimony, as Hoffmann-La Roche has failed to demonstrate that these issues fall outside the doctors' areas of expertise or that they are not relevant to the case. And to the extent that Hoffmann-La Roche takes issue with the materials upon which the doctors relied in formulating their opinions, that is a matter of credibility for cross-examination and does not affect the admissibility of the testimony. See *J. B. Hunt Transport v. Brown*, 236 Ga. App. 634, 635 (1) (a) (512 SE2d 34) (1999).[4]

4. We next address whether a jury issue exists on Bryant's claims for product liability.

> When ruling on a motion for summary judgment, the opposing party should be given the benefit of all reasonable doubt, and the court should construe the evidence and all inferences and conclusions therefrom most favorably toward the party opposing the motion. Further, any doubts on the existence of a genuine issue of material fact are resolved against the movant for summary judgment.

(Citations omitted.) *State Farm Fire &c. Co. v. Goodman*, 259 Ga. App. 62, 63 (1) (576 SE2d 49) (2002).

Bryant's claim for strict liability is one for defective design, as he asserts no allegation regarding the manufacture of the particular product consumed by his wife.

---

[4] Hoffmann-La Roche urges us to adopt the Federal Rules of Evidence standard for admission of expert testimony set forth in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U. S. 579 (113 SC 2786, 125 LE2d 469) (1993). But "[b]ecause *Daubert* involved application of a federal evidentiary rule which has not been adopted in Georgia, *Daubert* has not been adopted in Georgia either." *Orkin Exterminating Co. v. Carder*, 258 Ga. App. 796, 800 (1) (575 SE2d 664) (2002). And we decline to adopt *Daubert* here.

Unlike a manufacturing defect case, wherein it is assumed that the design of the product is safe and had the product been manufactured in accordance with the design it would have been safe for consumer use, in a design defect case the entire product line may be called into question and there is typically no readily ascertainable external measure of defectiveness.

(Citation and punctuation omitted.) *S K Hand Tool Corp. v. Lowman*, 223 Ga. App. 712, 718 (2) (479 SE2d 103) (1996).

As previously discussed, Georgia applies a risk-utility analysis to such claims. *Banks*, 264 Ga. at 735-736 (1). The factfinder may consider a number of factors, including the usefulness of the product, the gravity and severity of the danger caused by the design, the avoidability of the danger, the efficacy of any warnings, the ability to eliminate the danger without impairing the product's usefulness, and the user's ability to avoid the danger. Id. at 736, n. 6. Moreover, the weighing of these factors is generally a question for the jury. *Dean v. Toyota Indus. Equip. Mfg.*, 246 Ga. App. 255, 259 (3) (540 SE2d 233) (2000).

Dr. Dudley testified that Posicor was defective because it caused repolarization abnormalities that obscured the ability to adequately monitor the QT interval in the heart. He also testified that the drug induces bradycardia, a slowing of the heart rate, which would make it a poor choice for a patient who was susceptible to Torsades des Pointes in that it increased the risk that a patient would develop the condition. Dr. Dudley also testified as to inadequacies in Hoffmann-La Roche's testing of the product, which may have illuminated these defects, and stated that the warnings contained in the package insert on the drug were inadequate to fully alert physicians to these problems. Dr. Dudley further stated his belief that Posicor contributed to Mrs. Bryant's suffering an event of Torsades des Pointes, which resulted in brain injury. Dr. Kell testified that Posicor should not have been used with Betapace because both drugs increased the risk for Torsades des Pointes, and that the use of Posicor in connection with Betapace caused Mrs. Bryant's brain injuries.

We believe that this evidence was sufficient to present a jury issue on Bryant's product liability claim of design defect. And we find that Hoffmann-La Roche has not met its burden of establishing that it should be relieved from strict liability under Comment k, as it has not argued that the benefits of Posicor outweighed the risks or that there was no feasible alternative design for the drug. Accordingly,

the trial court erred in granting the company summary judgment on Bryant's claim of design defect.[5]

5. Bryant also asserted strict liability and negligent failure to warn claims, asserting that the warning provided to doctors in connection with Posicor was inadequate.[6] "[W]here prescription drugs are concerned, the manufacturer's duty to warn is limited to an obligation to advise the prescribing physician of any potential dangers that may result from the drug's use." (Punctuation and emphasis omitted.) *Hawkins v. Richardson-Merrell, Inc.*, 147 Ga. App. 481, 483 (1) (249 SE2d 286) (1978). Bryant presented Dr. Dudley's testimony that the package insert was inadequate to fully warn physicians of the potential dangers of prescribing Posicor, especially in connection with beta blocking agents. Although Dr. Kell also opined that it was below the standard of care for Mrs. Bryant's physician to have prescribed Posicor in conjunction with Betapace based upon the information available to him at the time, an issue remains as to whether the warnings Hoffmann-La Roche provided were sufficient under Georgia law.

6. Bryant further contends that the trial court erred in granting summary judgment to Hoffmann-La Roche on his claims for breach of warranty. Bryant has presented no evidence of any express warranty provided to his wife by Hoffmann-La Roche in connection with Posicor, and accordingly the trial court's grant of summary judgment on Bryant's claim of breach of express warranty was proper. Bryant asserts, however, that his wife was entitled to the protection of the implied warranties of merchantability and fitness for use under Georgia's Uniform Commercial Code. OCGA §§ 11-2-314; 11-2-315.

Mrs. Bryant's physician testified that at the time he prescribed Posicor for her, it was his practice to give his patients samples of the drug and then write a prescription if the samples were effective. The doctor obtained these samples from a Hoffmann-La Roche sales representative who visited his office to give him a sales pitch on Posicor. So the inference arises that Mrs. Bryant did not purchase the Posicor she ingested, but rather used a free sample provided by her doctor.

Assuming, without deciding, that the transaction between Hoffmann-La Roche and Mrs. Bryant's doctor was covered by the UCC, Bryant cannot establish that his wife was entitled to the benefit of

---

[5] Bryant also asserts claims for negligent design defect. Our Supreme Court has found that this claim cannot be treated as a distinct theory of recovery from the strict liability claims, as the same risk-utility analysis applies. *Ogletree v. Navistar Intl. Transp. Corp.*, 271 Ga. 644, 645 (522 SE2d 467) (1999). But see *Banks*, 264 Ga. at 735, n. 3 (where Supreme Court of Georgia stated "we see no reason to conclude definitively that the two theories [(negligence and strict liability)] merge in design defect cases").

[6] A claim for negligent failure to warn exists separately from strict liability claims. See *Battersby v. Boyer*, 241 Ga. App. 115, 116-117 (3) (526 SE2d 159) (1999).

the Code's implied warranties. It is undisputed that there was no privity between Hoffmann-La Roche and Mrs. Bryant because she did not purchase the drug directly from the manufacturer. Thus, this situation is controlled by OCGA § 11-2-318, which defines when a third party may benefit from warranties. Under that section:

> [a] seller's warranty whether express or implied extends to any natural person who is in the family or household of his buyer or who is a guest in his home if it is reasonable to expect that such person may use, consume, or be affected by the goods and who is injured in person by breach of the warranty.

OCGA § 11-2-318. Under Georgia's version of the UCC, therefore, only a very limited class of individuals who are not in privity with the seller are entitled to the protections of the seller's warranties. Because Mrs. Bryant was not a member of her doctor's household or family, nor was she a guest in his home, she is not entitled to an extension of any implied warranty existing between the drug manufacturer and the doctor. Accordingly, the trial court properly granted summary judgment to Hoffmann-La Roche on Bryant's claim for breach of implied warranty.

*Judgment affirmed in part and reversed in part. Barnes, J., concurs. Andrews, P. J., concurs specially.*

ANDREWS, Presiding Judge, concurring specially.

I concur with the majority's conclusion that Bryant's claims are not preempted by federal law. I also agree with the majority that the trial court properly granted summary judgment to Hoffmann-La Roche, Inc. (Hoffmann) on Bryant's claims for breach of express and implied warranties, and I agree that issues of fact remain that preclude the grant of summary judgment to Hoffmann on Bryant's claim for failure to warn. As to Bryant's claim that the prescription drug, Posicor, was defectively designed, I concur that the grant of summary judgment in favor of Hoffmann should be reversed, but not for the reasons stated by the majority.[7] As set forth below, I conclude that prescription drugs are a unique category of product, and that the risk-utility test adopted for design defect claims in *Banks v. ICI Americas, Inc.*, 264 Ga. 732 (450 SE2d 671) (1994) (based on the general design defect test in § 2 of Restatement (Third) of Torts: Products Liability), does not apply to prescription drugs. I would adopt

---

[7] Since Bryant's negligence based design defect claim cannot be treated as a distinct theory of recovery, it need not be separately addressed. *Ogletree v. Navistar Intl. Transp. Corp.*, 271 Ga. 644, 645 (522 SE2d 467) (1999).

the design defect test specifically crafted for prescription drugs in § 6 (c) of the Restatement Third. Since the parties have not had an opportunity to apply the newly adopted test, I would reverse the grant of summary judgment to Hoffmann on this issue and remand the case to the trial court to allow the parties to develop their best case under the new test. This would render premature most of the dispute over whether the trial court properly excluded the testimony of Bryant's experts. I concur with the majority that the trial court properly excluded the expert testimony to the extent it relates to whether the Food and Drug Administration (FDA) should have approved Posicor. As to whether other portions of the expert testimony are relevant to establishing Posicor was defective, I would conclude this issue should be reconsidered by the trial court on remand after the parties have had an opportunity to develop their cases under the new design defect test.

In *Banks*, 264 Ga. 732, the Supreme Court of Georgia adopted a new risk-utility analysis test for design defect cases based on the test set forth in § 2 of Restatement (Third) of Torts: Products Liability (the Restatement Third). *Jones v. NordicTrack, Inc.*, 274 Ga. 115, 118 (550 SE2d 101) (2001). Bryant's claim that a prescription drug was defectively designed is an issue of first impression in Georgia, so the *Banks* test has not previously been applied to prescription drugs, and there are compelling reasons to conclude that it does not apply.

Prescription drugs have historically been viewed as a category of products that present unique issues in a design defect claim. In 1965 the Restatement (Second) of Torts, § 402A recognized in comment k that some products, like prescription drugs, are unavoidably unsafe.

> *k. Unavoidably unsafe products.* There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. . . . Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it unreasonably dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared

and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.

(Emphasis omitted.) Restatement (Second) of Torts, § 402A, comment k. Although comment k has been widely adopted by courts which have applied § 402A to prescription drug design defect claims, most courts (as the majority opinion points out) have elected to apply the comment k protections to prescription drugs on a case-by-case basis. See *Feldman v. Lederle Laboratories*, 97 N.J. 429 (479 A2d 374) (1984); Conk, Is There a Design Defect in the Restatement (Third) of Torts: Products Liability?, 109 Yale L. J. 1087, 1094-1095 (2000). These courts generally hold that the protections of comment k should be limited to prescription drugs having a high degree of social need. On the other hand, a substantial minority of courts have applied comment k to hold that all prescription drugs are protected from design defect liability. *Brown v. Superior Court &c. of San Francisco*, 44 Cal.3d 1049 (751 P2d 470) (1988); *Grundberg v. Upjohn Co.*, 813 P2d 89 (Utah 1991); *Young v. Key Pharmaceuticals*, 130 Wn.2d 160 (922 P2d 59) (Wash. 1996); *In re Eli Lilly & Co.*, 789 FSupp. 1448 (S.D. Ind. 1992). These courts, recognizing a distinction between prescription drug products and other products, emphasize the public interest in encouraging the development and marketing of affordably priced prescription drugs despite unavoidable harm to some users, and point out that these products are obtainable only under a prescription by a physician.

When the Restatement Third was promulgated by the American Law Institute in the late 1990s it also recognized the unique nature of prescription drug products by creating a general design defect test along with a separate design defect test for prescription drugs. The general design defect test for nonprescription products is set forth in § 2 of the Restatement Third. This test, which was adopted in *Banks*, 264 Ga. 732, sets forth a risk-utility analysis which "balance[s] the risks inherent in a product design against the utility of the product so designed." *Jones*, 274 Ga. at 115-116. The "heart" of a design defect claim under this test is "the reasonableness of selecting from among alternative product designs and adopting the safest feasible one." Id. at 118. Under this test, a product can be found defective upon proof that, at the time the product was manufactured, a reasonable alternative design could have been used to avoid or reduce the foreseeable risks of harm presented by the product. *Banks*, 264 Ga. at 736-737.

The Restatement Third finds the risk-utility analysis set forth in

§ 2 unworkable for the unique issues presented by prescription drug design defect claims and sets out a separate test for prescription drugs in § 6 (c). Section 6 (c) provides:

> A prescription drug or medical device is not reasonably safe due to defective design if the foreseeable risks of harm posed by the drug or medical device are sufficiently great in relation to its foreseeable therapeutic benefits that reasonable health-care providers, knowing of such foreseeable risks and therapeutic benefits, would not prescribe the drug or medical device for any class of patients.

Under this test, a prescription drug product can be found defective upon proof that no reasonable health care providers would prescribe the drug to any class of patients. In other words, a plaintiff can prove a prescription drug was defective by showing there were safer designed prescription drugs on the market that reasonable health care providers would prescribe instead of the allegedly defective drug for all classes of patients. So like the general § 2 test, the § 6 (c) test allows a plaintiff to prove defectiveness by showing the existence of reasonable alternative designs in prescription drugs which have received FDA approval and are on the market and available to be prescribed. However, the § 6 (c) test does not allow a plaintiff to prove defectiveness by showing that the defendant manufacturer could have designed and marketed a safer prescription product that has not received FDA approval and is therefore not on the market. In this respect, § 6 (c) differs from the general § 2 design defect test, which allows proof that a manufacturer could have developed a safer alternative design that would have prevented the injury but which design was not developed or marketed. The former reporters of the American Law Institute's Restatement Third explain why the § 6 (c) test refuses to hold a prescription drug manufacturer liable for not developing a safer alternative drug:

> Such refusal rests not on deference to the FDA but on an understandable reluctance to allow courts to determine whether a proposed alternative drug would have received FDA approval. Development by a manufacturer of a safer alternative drug does not, by itself, help anyone. For physicians to prescribe such a safer drug, it must reach the market. To reach the market, a prescription drug must be approved by the FDA. Thus, the question of whether a new alternative drug should have been developed by the defendant must be recast as whether the proposed alternative drug would have won FDA approval in time to help the plaintiff.

No court can answer that question without seeking, in some manner, to replicate the FDA approval process.

(Footnotes omitted.) Henderson and Twerski, Drug Designs Are Different, 111 Yale L. J. 151, 163-164 (2001). As the former reporters and others have noted, the FDA drug approval process is an elaborate, expensive, and time-consuming regulatory regime that includes preclinical investigation and three phases of clinical trials including small, controlled studies of healthy and diseased humans and scientific double blind studies designed to identify possible health risks or side effects associated with a new drug. Id. at 164-166; Practical Guide to Food and Drug Law and Regulation, pp. 95-102 (K. Pina & W. Pines eds. 1998). The initial process is followed by submission of a new drug application to the FDA cataloguing the history of the drug's development and testing, which frequently consists of hundreds of thousands of pages. Henderson and Twerski, supra at 164-166. To develop and obtain FDA approval for a new drug under the entire process takes, on average, 12 to 15 years at a cost of $200 to $500 million. Id. at 165, n. 64. No court could replicate this process in a trial setting nor could any expert reliably testify that the FDA would have approved a proposed alternative drug. It follows that the different treatment accorded prescription drugs under § 6 (c) is a practical adjustment from the § 2 general risk-utility test that is appropriate to the unique nature of the products.

The prescription drug design defect test in § 6 (c) also differs from the general risk-utility test of § 2 in that it does not deem a prescription drug defective if it benefits any class of patients. Thus the test considers the welfare of the class of persons who benefit from having the prescription drug remain on the market. On the other hand, under the general § 2 risk-utility test, a product design is defective upon proof of a reasonable alternative design that could have avoided or reduced the risk of harm. *Banks*, 264 Ga. 732. As applied to nonprescription products, this test declares products defective and removes them from the marketplace through the tort system to protect the larger class of persons who are exposed to unreasonable risk, even though a smaller class of persons would have benefitted from continued careful use of the product. Because non-prescription products are available to everyone on the market, and it is not feasible to deny access to the product to the larger at risk class and grant access to the smaller careful class, the risk-utility test in § 2 removes the product from the market for the greater benefit of society. By contrast § 6 (c), which leaves a prescription drug on the market by refusing to deem it defective if it benefits any class of persons, recognizes that it is possible to grant access to prescription drugs to the class of persons who benefit from the product while

denying access to the class of persons who would be harmed. This is possible because prescription drugs are not available to everyone but can be obtained only through a prescription provided by a physician, a "learned intermediary" between the purchaser and the drug manufacturer, who has the power and responsibility to prescribe the drug only to those who would benefit. *Hawkins v. Richardson-Merrell, Inc.*, 147 Ga. App. 481, 483 (249 SE2d 286) (1978). Thus § 6 (c) recognizes that the unique nature of prescription drugs calls for a different test that attempts to maximize the benefits provided by unavoidably risky drugs and minimize the harm. Even if it is inevitable that some physicians will misprescribe a drug, this possibility remains the exception rather than the norm, and those harmed have tort remedies against negligent physicians who misprescribe despite adequate warnings provided by the drug manufacturer. If a physician misprescribes because the drug manufacturer failed to give the physician adequate warnings, then those harmed have a cause of action against the manufacturer for failure to warn. *Hawkins*, 147 Ga. App. at 483; Henderson and Twerski, supra at 158-174.

Although a design defect claim for prescription drug products under § 6 (c) is more difficult to prove than a design defect claim for nonprescription products under the risk-utility analysis of § 2, the Restatement Third established the more restrictive provisions of § 6 (c) for reasons that are well suited to the unique aspects of prescription products. Moreover, because a prescription drug may be found defective under § 6 (c), the Restatement Third refuses to provide the blanket protection provided to prescription drugs under comment k to § 402A of the Restatement Second. Although as the majority points out, § 6 (c) of the Restatement Third has not been widely adopted by other courts, this is not because it has been widely rejected during its brief existence — most courts have simply not had the opportunity to consider it as an alternative. The test for prescription drug design defects set forth in Restatement Third § 6 (c) establishes a better reasoned alternative to the design defect test adopted by the majority, which employs a case-by-case application of comment k as an affirmative defense in conjunction with risk-utility analysis.

Because I would adopt § 6 (c) as the test for prescription drug design defects, and the issue is one of first impression, I would remand this case to the trial court with instructions that the parties be allowed to conduct appropriate discovery and otherwise develop their respective cases under the new test. See *Banks*, 264 Ga. at 737.

DECIDED JULY 16, 2003 —

*Bird & Associates, Wendell R. Bird, Richard L. Brittain, Jonathan T. McCants*, for appellants.

*Nelson, Mullins, Riley & Scarborough, Richard B. North, Jr., Matthew B. Lerner*, for appellee.