**Joe CATLETT, et al., Plaintiffs**

v.

**WYETH, INC., et al., Defendants**

**No. 5:04–CV–154–2 (WDO).**

United States District Court,
M.D. Georgia,
Macon Division.

Sept. 14, 2004.

Jonathan J. Ross, Michael A. Lee, Houston, TX, William McCall Calhoun, Jr., Americus, GA, for Plaintiffs. ·

Stephen M. Brooks, Stephen Melvin Lore, Atlanta, GA, for Defendants.

### ORDER

OWENS, District Judge.

Plaintiffs brought this case in the Bibb County Superior Court against numerous defendants alleging injuries due to their use of diet drugs manufactured by Defendant Wyeth. Defendants removed the case to this court based on diversity jurisdiction. The case was eventually transferred with many other cases across the country to Multi–District Litigation ("MDL") in the Eastern District of Pennsylvania. After the case was partially settled and remanded from MDL, plaintiffs moved to remand the case back to the superior court alleging that complete diversity does not exist. Defendants oppose the motion to remand arguing that the only non-diverse defendants were fraudulently joined to defeat diversity. Those defendants are the 6 pharmaceutical sales representatives who worked for Wyeth during the time the drugs were promoted and sold. Defendants request the court to dismiss the claims against the sales representatives and proceed with the remaining claims against the other, diverse defendants. After a thorough review of the record, the court finds that a hearing is unnecessary and enters the following order.

Plaintiffs allege they developed valvular heart disease ("VHD") as a result of taking the diet drugs fenfluramine (Pondimin), dexfenfluramine (Redux) and/or phentermine, a combination of which is commonly known as "Fen–Phen."[1] In 1996 and 1997, Defendant Wyeth and its various subsidiaries produced and marketed Pondimin and Redux. There is a dispute over

---

1. Although the plaintiffs allege they suffer from VHD as a result of using Wyeth's diet drugs, most of the documentary evidence they provided deals with PPH and sales representatives who are not involved in this case. The plaintiffs' evidence is therefore mostly irrele-vant to the issues at hand. However, as the evidence must be construed in plaintiff's favor at this stage, the court will take the whole record into consideration for purposes of this order.

whether Wyeth produced and sold phentermine but for purposes of this order that is irrelevant. On September 15, 1997, Wyeth withdrew its diet drugs from the world market because of health concerns related to a possible link between the drugs and the development of VHD and primary pulmonary hypertension ("PPH").

Plaintiffs named as defendants Wyeth, f/k/a American Home Products Corporation, Wyeth Pharmaceuticals, Inc., Wyeth–Ayerst Laboratories and Wyeth–Ayerst International. Wyeth is a Delaware corporation with its principal place of business in New Jersey. Wyeth Pharmaceuticals is a Delaware corporation with its principal place of business in Pennsylvania. Wyeth–Ayerst Labs is a Delaware corporation with its principal place of business in Pennsylvania. Wyeth–Ayerst International is a New York corporation with its principal place of business in Pennsylvania.

Plaintiffs also named as defendants the following individuals, all of whom are residents of Georgia and were Wyeth sales representatives in 1996 and 1997: Robert Whatley, Lynn McLendon, Debra Martin, Crystal Flanders, Sharon Ashabranner and Christopher Blanton.[2] The sales representatives would visit a doctor's office to make them aware of the products and to provide material and information on the drugs to the doctors. The sales representatives were not involved in the design, manufacture, testing or labeling of the drugs. They had no role in any regulatory approval process for the drugs. They did not distribute the drugs to the plaintiffs although they did provide samples to the doctors. Further, the sales representatives had no role in developing the promotional materials given to the doctors. Plaintiffs contend the sales representatives failed to adequately warn the physicians of the alleged dangers associated with the diet drugs.

Plaintiffs allege negligence, fraud and conspiracy claims against all of the defendants. Defendants contend that Georgia courts would not recognize a cause of action against the sales representatives for negligence or fraud and that Georgia courts do not recognize a cause of action for intra-corporate conspiracy in any case. Defendants contend this court should ignore the citizenship of the sales representatives, dismiss those claims for lack of jurisdiction, deny the plaintiffs' motion to remand and proceed with the claims against the remaining defendants.

"Removability should be determined 'according to the plaintiff's pleading at the time of the petition for removal.'" *Coker v. Amoco Oil Co.*, 709 F.2d 1433, 1440 (11th Cir.1983) (citations omitted) (removal not fraudulent where procedural rule permitted plaintiff to name parties as was done in the pleadings), *sups'd in part by statute on other grounds as stated in, Wilson v. General Motors Corp.*, 888 F.2d 779 (11th Cir.1989). The "removing party bears the burden of proof on the issue of diversity." *Id.* (citations omitted). A removing party may defeat a non-removing party's motion to remand "if it shows that the joinder of the non-diverse defendants was fraudulent." *Id.* (citations omitted). "In order to establish that a fictitious resident defendant has been fraudulently joined, the removing party must show either that there is no possibility that the plaintiff would be able to establish a cause of action against the resident defendant in state court or that there has been outright fraud in the plaintiff's pleading of jurisdictional facts." *Id.* (citations omitted). "The district court must evaluate all factual is-

---

**2.** Plaintiffs also named certain "John Doe" defendants whose citizenship is not considered on a motion to remand. *Wilson v. General Motors Corp.*, 888 F.2d 779 n. 3 (11th Cir.1989).

sues and questions of controlling substantive law in favor of the plaintiff." *Id.* (citations omitted).

■ In another MDL pharmaceutical case, *In re Rezulin,* the court addressed fraudulent joinder and removal in cases where parties such as pharmaceutical company, physicians and sales representatives are named as defendants. *In re Rezulin Products Liability Litigation,* 133 F.Supp.2d 272 (S.D.N.Y.2001). In that case, the plaintiffs sought recovery for injuries allegedly sustained as a result of using Rezulin, a prescription diabetes medication. The plaintiffs named as defendants the manufacturer of the drug, pharmacies that sold the drug, physicians who prescribed the drug and the sales representatives. After a careful analysis of the plaintiffs' claims, the court determined that the plaintiffs lacked any reasonable basis under state law to join the sales representatives.

The court explained that, although some courts had stated that a removing defendant must show there is "no possibility" the plaintiff can prevail against the non-diverse defendant in state court, the phrasing "no possibility" could not be taken literally. *Id.* at 280 n. 4 (citation omitted). "Even if a plaintiff's claim against a non-diverse defendant were squarely precluded by a recent decision of a state's highest court or by a statute precisely applicable to the claim, there always would be a 'possibility,' however remote, that the court or legislature might change its mind so as to permit the plaintiff to prevail." *Id.* Citing several other circuits, the court noted that the standard is more accurately described as "requiring a showing that there is 'no reasonable basis' for predicting liability on the claims alleged." *Id.* (citing *Pampillonia v. RJR Nabisco, Inc.,* 138 F.3d 459, 461 n. 3 (2nd Cir.1998)) (citing *Badon v. RJR Nabisco, Inc.,* 224 F.3d 382,

393 (5th Cir.2000); *Boyer v. Snap-on Tools Corp.,* 913 F.2d 108, 111 (3rd Cir.1990)).

The court next addressed the claims against the pharmaceutical representatives pursuant to Alabama and Mississippi law. "Affidavits of the defendant sales representatives filed in each of the Mississippi cases [stated] that the sales representatives 'made no representations, by way of promotion or advertising or otherwise, or any statements whatsoever, including but not limited to representations regarding Rezulin to plaintiff or to the general public.'" *Id.* at 281. "The affidavit filed in the Alabama case [stated] that the sales representative had no dealings with plaintiff or plaintiff's decedent and did not 'make any statements to the general public or participate in any advertising or promotion to the general public concerning Rezulin.'" *Id.* The plaintiffs did not respond to the affidavits in any way. As a "consequence, the Court [could] conclude only that the joinder of these sales representatives lacked any reasonable basis in fact" but noted that the plaintiffs' failure to rebut the affidavits was not "the only basis upon which the Court [found] joinder of the sales representatives to have been improper." *Id.* (citations omitted).

The court next addressed the issue of whether the Supreme Court of Mississippi "would find that pharmaceutical sales representatives have a duty to warn of characteristics of prescription drugs they sell." *Id.* at 282. The court noted that no Mississippi court had resolved this precise issue but that Mississippi followed the "learned intermediary rule" which provides, "Where prescription drugs are concerned, the manufacturer's duty to warn is limited to an obligation to advise the prescribing physician of any potential dangers that may result from the drug's use." *Id.* (citations omitted). The rationale for this rule is that "[a]s a medical expert, the

prescribing physician can take into account the propensities of the drug, as well as the susceptibilities of his patient ... The choice he makes is an informed one, an individualized medical judgment bottomed on a knowledge of both patient and palliative. Pharmaceutical companies, then, ... in selling prescription drugs are required to warn only the prescribing physician, who acts as the 'learned intermediary' between manufacturer and consumer." *Id.* at 282 (citations omitted).

Applying this principle, the court found that pharmaceutical sales representatives have a duty to warn the physicians "to whom they promote the product" and have "no duty to warn patients." *Id.* Because of the learned intermediary rule, the court found there was no reasonable chance a Mississippi court would hold the sales representatives liable on a failure to warn claim. The court also found that the plaintiffs had not stated a viable claim against the sales representatives because they did not allege that the sales representatives "failed to warn the particular physicians who prescribed the drug for them, let alone that this alleged failure was the proximate cause of their injuries." *Id.*

The court also found that the complaint failed to allege the essential elements of fraud, "most obviously that the sales representatives knew that Rezulin was unsafe at the time they spoke but withheld the truth to mislead plaintiffs." *Id.* (citation omitted). Further, the plaintiffs failed to allege the time and place of the alleged misrepresentations. *Id.* Because questions of fraudulent joinder must be answered based on the pleadings at the time the complaint is filed, the court would not permit the plaintiffs to amend their complaint to allege new claims against the sales representatives.

The court then addressed the claims pursuant to Alabama law and began by noting that the plaintiffs failed to show that the defendant sales representative sold Rezulin to "plaintiff's decedent or to plaintiff's decedent's physician, thereby causing the alleged injuries." *Id.* at 286–87. "[To] establish a claim of fraud or fraudulent suppression, a plaintiff must show that he or she reasonably relied on the alleged misrepresentation and suffered damage 'as a proximate consequence.'" *Id.* at 287 (citations omitted). "The absence of any alleged connection between the sales representative and plaintiff's decedent therefore is fatal to all of the claims against the sales representative." *Id.* The court noted that the "sales representative joined in the Alabama case neither manufactured, sold nor supplied Rezulin." *Id.* at 287. "Rather, he was an agent of the manufacturer and seller. As a corporate employee, he was not 'the one best able' to prevent sales of defective drugs." *Id.* at 287–88 (citing an Alabama law that places the liability for losses incurred as a result of defective products on the one best able to prevent the distribution of the product in question). Based on Alabama law, there was no reasonable basis for supposing that the Alabama Supreme Court "would impose liability on the sales representative." *Id.*

An MDL panel consolidated the case at bar along with hundreds of other cases that involve claims against Wyeth, the drug manufacturer, and numerous other entities alleging injuries as a result of taking diet drugs manufactured and sold by Wyeth. *See In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine),* 220 F.Supp.2d 414 (E.D.Pa.2002). At the MDL level, "[v]oluminous discovery took place ... including depositions, document review, and the development of expert testimony." *Id.* at 420. The court found that "no epidemiologic data [supported] the position that phentermine, when combined with fenfluramine, increases the risk of PPH or VHD in humans" and that the

"proffered experts lacked reliability and a sufficient scientific basis for their opinions." *Id.* (citing *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589–90, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1999)).

The MDL panel addressed fraudulent joinder as it applied to some of the defendants involved, but not the ones in the case at bar. After reciting the fraudulent joinder standards cited above, the court noted that although it must resolve contested issues in favor of the plaintiffs, "we do not take this to mean we must blindly accept whatever plaintiffs may say no matter how incredible or how contrary to the overwhelming weight of the evidence." *Id.* at 420. Courts "are not to decide automatically in favor or remand simply because some facts may be said to be in dispute." *Id.*

The plaintiffs involved in those fraudulent joinder claims had asserted claims against numerous defendants, some of whom were pharmaceutical sales representatives, for negligence, failure to warn, misrepresentation and breach of warranty. The MDL panel found that the sales representatives were fraudulently joined because there was no indication that any of the plaintiffs, or any of the plaintiffs' doctors, received any drugs from the sales representative defendants and therefore the allegations of fraudulent misrepresentation fell "far short of what is required under both federal and Mississippi law." *Id.* at 424 (citing Mississippi case law that is similar to the Georgia case law cited below). Further, the court found that the "learned intermediary doctrine" precluded the plaintiffs' claims against the sales representatives. Finally, the court found that Mississippi law did not provide for a breach of warranty claim against the representatives because they "are not considered 'sellers' under Mississippi law, but rather, employees of the businesses who are sellers." *Id.* at 425 (citations omitted).

"Accordingly, there [was] 'no reasonable basis in fact or colorable ground supporting the claim against' the sales representative defendants." *Id.* at 425 (citation omitted).

In the case at bar, the court is required to look to Georgia law to determine whether the plaintiffs have any basis for a claim against the pharmaceutical sales representative defendants. Although the Georgia courts have not addressed the precise issue of a pharmaceutical sales representative's liability, there is some analogous case law that provides the guidance necessary to decide this issue.

In *Presto v. Sandoz Pharmaceuticals Corp.,* the plaintiff sued the manufacturer and distributor of prescription anti-psychotic drugs to recover for her adult son's suicide after he stopped using the medication. *Presto v. Sandoz Pharmaceuticals Corp.,* 226 Ga.App. 547, 487 S.E.2d 70 (1997). The trial court entered summary judgment for the defendants and plaintiff appealed. The court of appeals held that, pursuant to the learned intermediary rule, the manufacturer had no duty to warn the patient directly of any dangers associated with the drugs.

Pursuant to the learned intermediary rule, "the manufacturer of a prescription drug is not normally required to directly warn the patient of dangers in its use. 'Ordinarily, in the case of prescription drugs, a warning as to possible danger in its use to the prescribing physician is sufficient.'" *Id.* at 73 (citing *Singleton v. Airco, Inc.,* 169 Ga.App. 662, 314 S.E.2d 680 (1984); *Hawkins v. Richardson–Merrell, Inc.,* 147 Ga.App. 481, 249 S.E.2d 286 (1978); *Parke, Davis & Co. v. Mayes,* 124 Ga.App. 224, 183 S.E.2d 410 (1971)). The court noted that

this special standard for prescription drugs is an understandable exception to the ... general rule that one who mar-

kets goods must warn foreseeable ultimate users of dangers inherent in his products. Prescription drugs are likely to be complex medicines, esoteric in formula and varied in effect. As a medical expert, the prescribing physician can take into account the propensities of the drug, as well as the susceptibilities of his patient. His is the task of weighing the benefits of any medication against its potential dangers.

*Id.* at 73 (citation omitted in original). The plaintiffs made no claim that Sandoz, the drug company, failed to warn the physician, Dr. Warren, of the potentially adverse effects of Clozaril, the medication. "In fact, they [pointed] to such a warning included with the medication's packaging, and the record shows Dr. Warren signed a document stating he was familiar with all Clozaril package labeling. [The plaintiffs made] no argument that the warning given Dr. Warren was inadequate." *Id.* The court held that the learned intermediary rule applied and that Sandoz had no duty to directly warn the patient or the plaintiffs of the potential hazards of the use of the drug.

The court rejected the plaintiffs' claim that, since Sandoz provided a pamphlet that contained some information on the drug, Sandoz "voluntarily undertook to provide some information to patients" and thus had a duty to do so with ordinary, reasonable care. *Id.* The court held that the plaintiffs could not, as a matter of law, "have 'reasonably relied' on this pamphlet for such warning. The pamphlet [did] not constitute an effort to inform patients of all the dangers of Clorazil and [did] not purport to do so." *Id.* at 74. Because the plaintiffs relied on the doctor to prescribe and supervise their son's use of the drug, their claims against the manufacturer were without merit.

In *Jack v. Glaxo Wellcome,* the plaintiff brought suit against the manufacturer of Zyban, a drug used as an aid to stop smoking, and sought damages for injuries she allegedly sustained from use of the drug. *Jack v. Glaxo Wellcome, Inc.,* 239 F.Supp.2d 1308, 1311 (N.D.Ga.2002). Plaintiff sued Glaxo, the manufacturer of the drug, and claimed that Glaxo failed to provide an adequate warning that panic attacks and a panic disorder could result from ingesting the drug. The plaintiff alleged failure to warn, strict liability and breach of implied warranty.

The court limited Glaxo's duty by the learned intermediary doctrine. The court explained that the duty to warn of risks associated with prescription drugs "rests, not with the manufacturer, designer, or distributor, but solely with the treating physician, because the decision to employ prescription medication involves professional assessment of medical risks in light of the physician's knowledge of a patient's particular needs and susceptibilities." *Id.* at 1321. "This 'learned intermediary doctrine' is an understandable exception to the general rule that one who markets goods must warn foreseeable ultimate users of dangers inherent in his products." *Id.* (citing *McCombs v. Synthes (USA),* 250 Ga.App.543, 553 S.E.2d 17, 20–21 (2001); *Presto v. Sandoz Pharmaceuticals Corp.,* 226 Ga.App. 547, 487 S.E.2d 70, 73 (1997); *Hawkins v. Richardson–Merrell, Inc.,* 147 Ga.App. 481, 249 S.E.2d 286, 288 (1978); *Wheat v. Sofamor, S.N.C.,* 46 F.Supp.2d 1351, 1363 (N.D.Ga.1999)). "Thus, Glaxo's duty to warn regarding Zyban extends only to the prescribing physician." *Id.*

The plaintiff also argued that Glaxo failed to adequately warn doctors of the alleged risks associated with the drugs. The court rejected this claim and explained, "The package insert clearly represents nervousness and anxiety as treatment emergent adverse events occurring during the comparative trial. The insert also lists CNS (central nervous system)

stimulation as an event observed during the clinical development and postmarketing experience of [the drug]." *Id.* at 1322.

The court held that the plaintiff failed to create a genuine issue of fact regarding general causation. Further, "even if her theory of causation were accepted, the defendants would be insulated from liability by the learned intermediary doctrine." *Id.* The court granted the defendants' motion for summary judgment. *See also Ellis v. C.R. Bard, Inc.*, 311 F.3d 1272 (11th Cir. 2002) (applying Georgia law to find, based on learned intermediary rule, manufacturer of morphine pump not liable for injuries sustained through use of the device where pamphlets were provided to doctors, training was provided by the sales representatives to the medical staff, where doctors, nurses and the patient had actual knowledge of risks involved and where dangers of the device were well known in the medical community); *Bryant v. Hoffmann–La Roche, Inc.*, 262 Ga.App. 401, 585 S.E.2d 723 (2003) (no breach of warranty claim by patient who used drug because there was no privity between the manufacturer of drug and patient since patient did not purchase drug directly from manufacturer).

It is clear that Georgia courts would find the "learned intermediary rule" encompasses any fraud, fraudulent concealment, misrepresentation, failure to warn or breach of warranty claims related to the sale and use of prescription drugs. Therefore, in Georgia, pharmaceutical companies have a duty to warn *only* the physicians who will be prescribing the drug to their patients because the physicians are the ones with the expert medical knowledge regarding the safety and proper use of a particular drug. The physicians are also the only ones with personal knowledge of each individual patient's needs and ability to safely take the drug in

question. There is no basis for a claim against a sales representative under the learned intermediary doctrine that imposes a duty on the *manufacturer* of the drug to warn the physicians. Although the manufacturers employ the sales representatives to be *one source* of that information, the manufacturers are the ones who are ultimately responsible and thus liable under Georgia law for any alleged failure to provide information related to prescription drugs. This is further explained by an examination of Georgia's agency law.

Georgia law would not hold the pharmaceutical sales representatives in this case (the "agents") liable for any duty allegedly breached by Wyeth (the "principal"). To determine whether the sales representatives committed any individual tortious acts, a brief analysis is warranted regarding the efforts undertaken by the sales representatives to provide the necessary information to the physicians, recognizing that it is not proper at this stage to engage in a full-fledged merits analysis of the plaintiffs' claims.

The record is replete with evidence that Wyeth continually informed the public, and often the doctors specifically, about the ongoing research involving the drugs in question. The record shows that Wyeth sent out hundreds of thousands of "Dear Doctor" letters that regularly updated the doctors on the research and explained the risks of taking the drugs in question.

An example of this is a July 24, 1997 letter addressed to the "Health Care Provider" that informed individuals in the health care field of labeling changes for Pondimin and Redux as a "result of heightened concern regarding potential side effects which have been reported with concomitant use of ... fen/phen."[3] The letter noted that a boxed warning would be added to the physician and patient labeling

**3.** R. at 22, Ex. 18.

discussing a potentially serious and unusual form of VHD associated with the drugs. The letter also stated that evidence of a causal relationship between the treatment of obesity with the drugs in question and VHD and PPH was inconclusive but that Wyeth was initiating scientific studies to supplement then currently available data. Further, the letter informed doctors that it was not recommended for doctors to prescribe the concomitant use of the drugs with each other or other weight loss drugs to create the "fen-phen" combination.

Another example [4] was a telephone message sent to the sales representatives by Wyeth. The message informed the sales representatives that in a few days the Mayo Clinic would be releasing the latest information on the studies involving a possible link between cardiac valvular disorders and phentermine and fenfluramine. The message provided the latest information available so that the sales representatives would be equipped to answer any questions or concerns posed by the doctors. Finally, the message informed the sales representatives that they should let Wyeth know what the doctors thought about the latest studies and that they should provide Wyeth with any feedback they get from the doctors. The record shows that the sales representatives then visited all their physician clients and explained the latest findings on the drugs. This shows that the sales representatives were following instructions formulated by Wyeth and that they performed at Wyeth's direction and in the manner dictated by Wyeth.

The sales representatives also provided affidavits affirming that they followed the script given to them by Wyeth and answered the doctors' questions as fully as possible. Plaintiffs failed to rebut these affidavits in any way and failed to present any evidence to the contrary. Because the plaintiffs failed to rebut the affidavits, the court accepts them as evidence relevant to the findings it must make in this case.

Based on the foregoing, the plaintiffs failed to allege a negligence or fraud claim against the sales representatives that would be recognized by a Georgia court. For that reason, those claims will be dismissed and disregarded for purposes of determining diversity jurisdiction. However, the plaintiffs brought other claims against the defendants that must be analyzed before the final remand decision can be made.

■ Plaintiffs alleged a conspiracy claim against all of the defendants regarding Wyeth's manufacture and distribution of the diet drugs. However, Georgia courts are clearly unwilling to recognize claims of 'intra-corporate' conspiracies. That is, Georgia courts recognize the principle that a corporation cannot conspire with itself because employees of a corporation are considered part of the corporate entity. *See Nalley Northside Chevrolet, Inc. v. Herring,* 215 Ga.App. 185, 450 S.E.2d 452, 455 (1994) ("instruction on conspiracy was not supported by the evidence because a corporation cannot conspire with itself and here no allegation was made that [the employee who made the alleged misrepresentations] acted outside the scope of his employment");*Alta Anesthesia Associates of Georgia, P.C. v. Gibbons,* 245 Ga.App. 79, 537 S.E.2d 388 (2000) (no intra-corporate conspiracy claim available in Georgia; employer liable for torts committed by its employees that are within scope of employer's business); O.C.G.A. § 51–2–2 (principals liable for torts committed by their agents that fall within the scope of the principal's business, whether the same are committed negligently or voluntarily).

■ Although employers are responsible for some torts committed by their em-

4. R. at 13, Ex. 29.

ployees that are within the scope of the employer's business, Georgia courts do not recognize the reverse of that principle; that is, employees are not responsible for the tortious acts of their employers. In *Verddier v. Neal,* the plaintiff brought a products liability action against the manufacturer of an allegedly defective garage door. *Verddier v. Neal Blun Co.,* 128 Ga.App. 321, 196 S.E.2d 469 (1973). The plaintiff, a housekeeper in the residence where the garage door was installed, sued the manufacturer and seller of the door. Because the plaintiff did not allege any specific acts of negligence against the seller, the court rejected the claim against that entity and explained, "It is elementary that the principal is liable for the torts of its agent committed with the scope of his authority. However, it is generally recognized that an agent is not liable to third persons for the failure of the principal to discharge affirmative duties which the principal may owe." *Id.* at 470 (citations omitted). The Georgia Court of Appeals affirmed summary judgment for the seller because there was no privity between the plaintiff and the seller and the plaintiff failed to allege any negligence on the part of the seller.

In *Leal v. Hobbs,* the widow of an arrestee who died in an ambulance following his arrest sued, among other individuals, the paramedic student intern who was riding in the ambulance and assisting in the care of the plaintiff's husband. *Leal v. Hobbs,* 245 Ga.App. 443, 538 S.E.2d 89 (2000).

The Georgia Court of Appeals held that "whether [the student intern] was an employee, independent contractor, or agent of Grady Hospital is irrelevant to [his] liability. Under Georgia law, a hospital may be held vicariously liable for the negligent acts of its employees, contractors, or agents. But the doctrine of vicarious liability does not make the agent liable for the acts of the principal." *Id.* at 91 (citation omitted).

In the case at bar, a Georgia court would interpret the plaintiffs' conspiracy claims as an attempt to allege an "intracorporate" conspiracy between Wyeth and its sales representatives and would dismiss the claims. A Georgia court would not hold the sales representatives liable for any breach of duty by Wyeth either. Because those claims would not be recognized in a Georgia court, this court is required to disregard them for purposes of diversity jurisdiction.

Based on the foregoing, the plaintiffs failed to state any claims against the nondiverse sales representatives that would be recognized by a Georgia court. The court HEREBY DISMISSES the claims against the sales representatives, Whatley, McLendon, Martin, Flanders, Ashabranner and Blanton, and the case will proceed with the claims against the diverse defendants. The Motion to Remand is DENIED.